IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FOLSOM METAL PRODUCTS, INC., an )
Alabama corporation; RBOP TOOLS )
INTERNATIONAL, INC., a Texas )
corporation, )
  )
      Plaintiffs, )
  )
     v. )
  )
TORUS EQUIPMENT COMPANY, )
  )
      Defendant. )
  )
TORUS EQUIPMENT COMPANY, )
  )
      Counter-claimant, )
  )
     v. )
  )
FOLSOM METAL PRODUCTS, INC.; RBOP )
TOOLS INTERNATIONAL, INC., a Texas )
corporation, )
  )
      Counter-defendants. )
  )
RBOP TOOLS INTERNATIONAL, INC., a )
Texas corporation "RBOP Tools" )

      Intervenor-plaintiff.

ENTERED

SEP _ 2 1998

CIVIL ACTION NO. 94-G-0988-S

## MEMORANDUM OPINION

## I.

## FACTUAL BACKGROUND

This cause is before the court upon cross motions for summary

judgment filed by the parties. This case has its origins in the sale by Torus

Equipment Company ("Torus") of all proprietary rights and technical know-how relating to a device used to guard against accidents in certain types of oil drilling operations, known as a rotating blowout preventer ("RBOP"), to a subsidiary of Folsom Metal Products, Inc. ("Folsom").[1] One of the provisions of the sales contract provided for the payment for the period of ten years of a royalty by Folsom upon the sale or rental of each RBOP unit. A dispute subsequently arose between Folsom and Torus over the calculation and payment of those royalties, which resulted in a lawsuit. As a result, Folsom and Torus entered into a settlement agreement, which among other things, provided a new formula for calculating the royalty due upon the sale or rental of RBOP units. The new formula in essence provided for the payment of five percent of the gross receipts received by Folsom for the sale or rental of RBOP units.[2] Approximately one year after the settlement agreement was executed, Folsom sold its interest in the RBOP and a number of RBOP units to a predecessor of RBOP Tools International, Inc. ("RBOP Tools"). Folsom believed its obligation to Torus would be satisfied by

---

[1] For the purposes of this opinion, "Torus", "Folsom", and "RBOP Tools" will be used to refer to the parties regardless of the actual name of their predecessors or subsidiaries.

[2] This royalty provision will be considered in detail below. The summary of that provision set out here to provide context should not be taken as a decision by the court as to the interpretation of that clause.

2

paying, as it was received from RBOP Tools, 5% of $2,100,000 (that portion of the sales price that was attributed to the sale of the RBOP units). Accordingly, Folsom tendered such sum to Torus. Torus refused that tender and this lawsuit resulted.[3]

Folsom seeks a declaratory judgment that it is only obligated to pay Torus 5% of $2,100,000 as such sums are received from RBOP Tools, and that it has no further obligation to Torus for royalties. RBOP Tools intervened and seeks a declaration that it is not obligated to pay Torus any royalties upon the future sales or rentals of RBOP units and that it is entitled to indemnification from Folsom for any sums it is found to owe Torus. Torus counterclaimed against both Folsom and RBOP Tools. Torus seeks a declaration that Folsom is still liable to Torus for royalty payments upon the future sales or rentals of RBOP units by RBOP Tools, or alternatively, that Folsom is in default under the agreement, thereby relieving Torus of its obligation not to compete. Torus also seeks a declaration that RBOP Tools has assumed the obligation to pay royalties.

---

[3] The foregoing factual discussion is intended only as a brief summary in order to provide context for the discussion that follows. The opinion of the court of appeals, reported at 113 F.3d 212, contains an extensive discussion of the factual background of the case.

Prior to the reassignment of the action to this district judge, the district court entered an order granting the motions for summary judgment previously filed by Folsom and RBOP Tools. That order contains the following:

> After a review of the relevant contract provisions of record, which the court finds to be clear and unambiguous, it is Ordered that plaintiff Folsom's and plaintiff intervenor RBOP Tool's [sic] motions for summary judgment are hereby GRANTED.

* * * *

> The court hereby enters a declaratory judgment that plaintiff Folsom is only required to make payments to Torus of five percent (5%) of the purchase price of the RBOP units as such sums are received pursuant to the terms of the Sales Agreement and Settlement Agreement, and that there is no continuing obligation owed to Torus from Big D Alabama Acquisition Corp., RBOP Tools International, Inc., or any other successors in interest to the RBOP units.

The Eleventh Circuit Court of Appeals reversed that decision and remanded the action for further proceedings.

Following remand, the action was reassigned to this district judge. Several conferences were held to consider the posture of the case. At a conference held March 4, 1998, the court indicated to the parties that it was of the opinion that many, if not all of the issues remaining for decision could be disposed of by cross motions for summary judgment after the record was more fully developed in accordance with the mandate of the court of appeals. The parties were specifically

4

requested to inform the court in their submissions of any parol evidence they wished to introduce to resolve ambiguities that they believed existed in the written contract documents. A schedule was established for the refiling of cross motions for summary judgment by the parties, and for the submission of briefs and evidentiary materials. The motions are now ripe for decision.

Three broad categories of issues are presented by the motions for summary judgment. First are questions relating to Folsom's liability to Torus for any sums in excess of 5% of $2,100,000. That sum represents the portion of the purchase price paid by RBOP Tools attributed to the sale of the RBOP units. Second are questions relating to RBOP's liability to Torus by virtue of successorship or otherwise. Third is the question of whether RBOP is entitled to indemnification from Folsom for any sums it might have to pay to Torus.

Torus has made it clear that it does not raise an impossibility of performance defense.

> Torus also falsely states Folsom's position in its Response by alleging that Folsom's position is impossibility of performance. This is blatantly untrue. Folsom's position is that it has satisfied the Agreements, not that the Agreements are impossible to perform.

5

(Folsom's Reply to Torus's Response to Folsom's M. for Sum. J. at 11)(citations omitted). Therefore, on remand the issue facing the court is one of contract interpretation.

Because the district court in its previous decision did not make specific rulings as to the admissibility of parol evidence, the court believes those issues are alive on remand. Therefore, the court will turn to the question of whether the parol evidence proffered by the parties is admissible.

## II.

## THE TERMS OF THE CONTRACT BETWEEN TORUS AND FOLSOM

### A. DO THE WRITTEN CONTRACT DOCUMENTS REPRESENT A COMPLETE INTEGRATION OF THE PARTIES' AGREEMENT?

The first question that must be addressed is whether the written contract documents constitute a complete integration of the agreement between Folsom and Torus. This is a question of law to be decided by the court. Moore v. Pennsylvania Castle Energy Corp., 89 F.3d 791 (11th Cir. 1996). This question must be answered at the outset because its resolution determines the extent to which parol evidence will be admissible. As the Alabama Supreme Court has explained: "The parol evidence rule . . . applies only when the parties to an agreement reduce it to writing, and agree or intend that the writing shall be their

6

complete agreement." Hibbett Sporting Goods v. Biernbaum, 375 So.2d 431, 434

(Ala. 1979). In Hibbett the court set forth the standard for deciding this question:

> The question whether the parties have assented to a writing as a complete and accurate integration of their contract is ultimately one of intent and must be determined from the conduct and language of the parties and the surrounding circumstances. The written document alone is insufficient.

375 So.2d at 436. The court then noted an apparent paradox:

> Indeed, the very testimony that the parol evidence rule is supposed to exclude is often, if not always, necessary before a court can determine that the parties have agreed upon the writing as a complete and accurate statement of their contract. The evidence that the rule seems to exclude must be heard and weighed before it can be excluded by the rule. The paradox, however, is only apparent. Parol evidence of the alleged negotiations leading to the written agreement is received by the trial court only on the issue of whether the offered writing was mutually assented to as a complete integration.

375 So. 2d at 436. Therefore, before it can be determined whether or not the parol

evidence rule applies, the court must determine whether the written contract

documents[4] constitute a complete integration of the parties' agreement.

---

[4] The written contract documents between Torus and Folsom consist of the original sales contract and a "Settlement Agreement and Mutual Release" executed in connection with the settlement of a lawsuit. The settlement agreement made certain modifications to the sales agreement, but in other respects left the sales agreement in force. References to the "written contract documents" will mean these two documents collectively.

The court is guided in its determination by several factors. The presence in the written contracts of an integration clause is an important factor. "The presence or absence of an integration clause may be a significant, although not a conclusive, factor in ascertaining whether the parties intend the written instrument to be a complete integration." Moore, 89 F.3d at 797-98, n. 3. The original sales contract between Torus and Folsom provides as follows:

> This Agreement herein contained and expressed constitutes the entire Agreement, express or implied, between the parties hereto and supersedes any previous oral or written negotiations or agreements, and may only be modified or altered by amendments in writing to this Agreement.

The settlement agreement between Torus and Folsom contains the following integration clause:

> This Settlement Agreement and Mutual Release contains the entire agreement between the parties hereto and supersedes any and all agreements, whether written or oral, relating to the subject mater hereof. This agreement may be amended only by a writing signed by both parties.

The settlement agreement also contains the following:

> [T]he undersigned have carefully read the foregoing Settlement Agreement and Mutual Release, [and] know the contents thereof . . . .

The above quoted passages clearly show that the written contract documents on their face represent that they are intended to be a complete integration of the

8

agreement between Torus and Folsom. Neither Torus nor Folsom has argued that the integration clauses quoted above did not reflect their intentions relative to the integration of prior negotiations or oral agreements into the written documents.

In Moore, the court noted that the writing under consideration was "a formal document that appears to embody all the terms of the parties' agreement with respect to the six wells, as opposed to an informal memorandum not purporting to be complete." 89 F.3d at 797. The court noted this as a reason for finding that the writing in question represented a complete integration of all prior negotiations. In the present case, the original agreement and subsequent settlement agreement are both formal contract documents and appear to represent the entire agreement between the parties as to the subject matters contained therein.

The Moore court also noted that one of the parties had "insisted upon certain changes before she agreed to sign it, which indicates that she recognized the importance of the written document in governing the parties' relationship." 89 F.3d at 797-98. In the instant case, Aubry Clinton Folsom, the owner of Folsom Metals, in his deposition noted that substantial changes were made in the sales agreement: "However, Torus, through counsel or otherwise, after substantially [sic] changes to the initial draft, prepared the final version of the Sales

9

Agreement." (Deposition of Aubrey Clinton Folsom at 7.) Again, this is strong evidence that both Torus and Folsom understood the importance of the written sales agreement.

As for the written settlement agreement, it can hardly be questioned that the parties regarded it as constituting the entire agreement between the parties—it being executed in order to settle a dispute between Folsom and Torus that had resulted in a lawsuit. It is unreasonable to conclude the parties to a lawsuit would fail to include any oral agreements or understandings relating to the dispute in the written document purporting to settle that dispute. It is important to note that that lawsuit involved a dispute concerning the payment of royalties— the primary issue presented in the instant case.

For the above reasons, the court concludes that the written sales agreement and written settlement agreement represent a complete integration of the agreement between Torus and Folsom with respect to the subject matters contained therein. None of the parol evidence submitted indicates otherwise.

B.    THE PAROL EVIDENCE RULE AND THE QUESTION OF
"LATENT AMBIGUITY"

Once it is determined that the writings represent a complete

integration of the agreement between the parties, the parol evidence rule comes

into play.  As the court in <u>Moore</u> noted:

> Under Alabama law, once the parties to a contract have reduced their
> agreement to writing, <u>all prior statements, promises, and negotiations
> are merged into the written document</u>.  In the absence of fraud,
> mistake or illegality, <u>parol evidence is not admissible to explain,
> contradict, vary, add to, or subtract from the express terms of a
> complete and unambiguous written agreement</u>.

89 F.3d at 795 (emphasis added)(citations omitted).   In the absence of an

ambiguity in the written contract, parol evidence is not admissible.

> Under Alabama law, extrinsic evidence relating to the alleged
> "true intent" of the parties is not admissible if the written document is
> clear and unambiguous.  However, resort to parol evidence is proper
> to show that the <u>contract language</u> contains a "latent ambiguity."  An
> ambiguity is latent when the language employed is clear and
> intelligible and suggests but a single meaning, but some extrinsic fact
> or extraneous evidence creates a necessity for interpretation or a
> choice among two or more possible meanings.

<u>Moore,</u> 89 F.3d at 795-96 (internal quotation marks and citations omitted)

(emphasis added).  However, as the above quotation acknowledges, there exists an

exception to the rule, which allows the introduction of parol evidence when the

contract contains a latent ambiguity.  Parol evidence may be resorted to in order to

11

demonstrate that the written contract contains a latent ambiguity. However, should the parol evidence fail to demonstrate the presence of a latent ambiguity, it cannot be used to aid in the interpretation of the written contract.

Before continuing, it will be helpful to note that the term "ambiguous" when used in relation to contracts may have several meanings. Three types of ambiguity in contracts have long been recognized in Alabama. Written contracts are said to contain a "patent ambiguity" when the writing is unclear on its face. Parol evidence is not admissible to remove a patent ambiguity. If the wording of the contract appears clear on its face, a "latent ambiguity" may be shown to exist through the introduction of parol evidence. There is a hybrid type of patent ambiguity that exists when the contract wording is unclear on its face, but parol evidence is admitted to remove latent ambiguities that cause the apparent patent ambiguity. See, Higgins v. Tennessee Coal, Iron & R. Co., 62 So. 774, 774-75 (Ala. 1913)(explaining these three types of ambiguity). The important point is that parol evidence may only be introduced in the case of latent ambiguities.

The next question that the court must consider is whether the written contract between Torus and Folsom contains a latent ambiguity. "Whether a written contract is ambiguous is a question of law for the court . . . ." Moore, 89

12

F.3d at 796. Courts are not provided with a great deal of guidance in determining

the precise legal definition of "latent ambiguity."

> We find little aid in Alabama cases for discerning a legal
> definition of "ambiguous." Courts of other states have said if a
> contract remains reasonably susceptible to more than one meaning
> after the court applies established rules of interpretation, the contract
> is ambiguous, but if only one reasonable meaning clearly emerges, it
> is unambiguous. . . . The pertinent rules of interpretation for
> determining the intent expressed in the contract are: look to the
> contract as a whole; look to its nature, purpose and the subject matter
> with which it deals.

Federated Guar. Life Ins. Co. v. Dunn, 439 So.2d 1283, 1285 (Ala. Civ. App.

1983)(emphasis added). As that court noted, the emphasis must be on

"reasonable." An unreasonable interpretation will be rejected by the court when

determining whether a contract contains latent ambiguities.

> Even where a party seeks to prove a latent ambiguity, the
> interpretation urged by that party must be reasonable. No latent
> ambiguity exists unless the contract is actually susceptible to the
> meaning contended for by a party.

Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354 (11th Cir. 1988). See also,

Moore, 89 F.3d at 796 (rejecting an unreasonable interpretation of the contract

urged by one of the parties); Federated, 439 So. 2d at 1285 ("An unreasonable

interpretation of words in a contract may not be used to create ambiguity.") (citing

Robbins Tire and Rubber Co. v. United States, 462 F.2d 684 (5th Cir. 1972).

Before considering the parol evidence submitted by the parties and considering whether it demonstrates the presence of a latent ambiguity, it is important to note the limited use to which that evidence may be put even if a latent ambiguity is found. If the court concludes that a latent ambiguity exists, "parol evidence may be admitted for the purpose of explaining or clarifying the <u>language</u> revealed to be ambiguous, <u>but not for the purpose of uncovering the parties'</u> <u>alleged 'true intent</u>.'" <u>Moore</u>, 89 F.3d at 796 (emphasis added). The court continued:

> As the Supreme court of Alabama explained:
>
>> Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the intention of elucidating the meaning of the words employed; and in its admission, the line which separates evidence which aids the *interpretation* of what is in the instrument, from direct evidence of intention independent of the instrument, must be kept steadily in view; <u>the duty of the</u> <u>court being, to declare the meaning of what is written in the</u> <u>instrument, not of what was intended to be written</u>.

89 F.3d at 796 (emphasis supplied by underlining added). It will be helpful to keep this standard in mind when reviewing the proffered parol evidence.

The court has reviewed the proffered parol evidence submitted by the parties and concludes that none of it establishes the existence of a latent ambiguity in the written contracts. Mr. Folsom's testimony is essentially that he and Mr.

14

Piper, the president of Torus, discussed the possibility of a sale of the RBOP

business and that it was understood that neither Folsom nor the entity buying the

business would owe a continuing royalty in that event. The following excerpts

from his deposition illustrate the import of his testimony:

> At the time that we were discussing this agreement I made it
> absolutely crystal clear that I would most likely sell the division of
> the rotating blow out preventers prior to the ten years elapsing, and
> that at the time that I sold it that I did not expect to have any ongoing
> royalties or anything of that nature.

(Folsom depo. at 23.)

> The very first day that we discussed this issue it was stated that I
> would most likely sell this project before the end of the ten years and
> I brought up the point that I wanted it very clear that I would not have
> to pass along some complex royalty agreement to a subsequent owner
> of the blowout preventers if it was purchased as an ongoing business
> unit.

(Folsom depo. at 161.) Mr. Folsom's testimony clearly falls within the realm of

negotiations leading up to the formalization of the parties' agreement into a

written contract. None of his testimony has the effect of suggesting that any of the

terms in the contract contain latent ambiguities. He simply testifies as to his

understanding as to what was agreed to before the agreement was formalized in

writing.

15

The testimony of Mr. Piper likewise does not suggest the presence of

a latent ambiguity in the written contract documents. Examples of his testimony

follow:

> 13. It was my understanding and intent . . . that Paragraph 13.3 of the Agreement, dealing with assignment, and Paragraph 13.4 of the Agreement, titled "Effect", meant that Folsom could sell the RBOP business, or substantially all of the assets used in the RBOP business, and that the royalty would be binding upon the buyer which would pay the royalty for the remainder of the ten year period agreed upon.

> 14. It was my understanding and intent . . . that Paragraph 10.1(b) of the Agreement . . . would not apply if the RBOP business, or substantially all of the assets used in the RBOP business, were sold by Folsom, as the RBOP business would continue to be operated by Folsom's successors and assigns, but the default Paragraph would apply if Folsom decided not to pursue the RBOP business . . . .

> 15. There was no discussion or agreement in the meetings to negotiate the Agreement for sale of the RBOP technology that the royalty would stop before the end of ten years.

> 16. There would have been no agreement by Torus with Folsom to sell the RBOP technology, if there was any indication that the royalty could stop before the end of ten years with no further obligations by Folsom.

(Piper Aff. at 3-4.) Again, none of Mr. Piper's testimony suggests that any of the

terms of the written contracts contain latent ambiguities. His testimony merely

relates to his intentions and understanding as to the parties' agreement that was

subsequently memorialized in the written contract documents.

16

The proffered testimony clearly falls into the category of inadmissible parol evidence. It does not relate to the interpretation of terms contained in the writing, but rather recites the parties' relative understanding as to the content of the negotiations that preceded the written contract documents. As the Alabama Supreme Court recognized in Hibbet:

> Agreements are often the result of protracted negotiations during which terms are modified or abandoned completely; but once the parties have completed their negotiations and have agreed upon a contract as evidenced by a writing, we are no longer interested in the history of their negotiations for purposes of determining what their agreement might have been had their negotiations proceeded differently. All their negotiations have then been merged into the written agreement and to the extent that the writing is complete and unambiguous, the prior negotiations are irrelevant for determining the terms of their agreement.

375 So.2d at 435 (emphasis added). Therefore, in the instant case, none of the parol evidence proffered by Torus or Folsom is admissible. It attempts to add to, rather than to explain, the written contract documents.

## C. INTERPRETATION OF THE WRITTEN CONTRACT DOCUMENTS

Having decided that the proffered parol evidence does not establish the presence of a latent ambiguity, the court must construe the contract between Torus and Folsom as embodied in the written contract documents. Furthermore, just because the written contract documents do not contain latent ambiguities does

not mean that the contract is clear and susceptible to only one interpretation; it merely means that parol evidence is not admissible to explain the meaning of terms contained in the written contract. When the interpretation of a contract must come from the writing itself, a question of law is presented, which must be decided by the court. Ammons v. Franklin Life Ins. Co., 348 F.2d 414, 416 (5th Cir. 1965); American and Foreign Ins. v. Tee Jays, 699 So.2d 1226, 1228 (Ala. 1997)("It is further the province of the court, not the jury, to construe a policy, even though ambiguous and unclear but not void for uncertainty, where its interpretation must come from the writing itself.")

The dispute between Torus and Folsom involves primarily three provisions of the written contract documents. The original sales agreement provides for the payment by Folsom to Torus in pertinent part as follows:

3.1    In consideration of the sale, transfer and conveyance of the propietary [sic] rights of SELLER to the RBOP, . . . PURCHASER shall pay to SELLER as follows:

(a)    PURCHASER shall pay to SELLER, in U.S. Dollars, One Hundred Thousand Dollars ($100,000 Dollars) as follows:

(1)    PURCHASER shall pay SELLER Fifty Thousand Dollars ($50,000) when PURCHASER receives funding for the production of a prototype of the RBOP; and

(2)    PURCHASER shall pay SELLER an additional Fifty Thousand Dollars ($50,000) in ten equal

18

installments of Five Thousand Dollars ($5,000), each of such installment payments being due upon the sale or rental by PURCHASER OF THE FIRST TEN (10) RBOP'S (excluding the prototype RBOP), such installment payments for each additional unit of said ten (10) units being due within 30 days of delivery of each such unit.

(b)    In addition to the One Hundred Thousand Dollars ($100,000) paid SELLER pursuant to 3.1(a) hereof, PURHCASER [sic] further agrees to pay SELLER for a period of 10 years from the date of delivery of first RBOP for sale or rental by PURCHASER an additional sum of money (in U.S. Dollars) wherein such additional sum shall be determined by multiplying the gross receipts from the sale or rental of the RBOP'S (excluding receipts from the sale or rental of the prototype by one-half (1/2) of the Net Profit Percentage. For purposes of this Agreement, the Net Profit Percentage shall never exceed ten percent (10%). Therefore, the maximum additional sum of money receivable by SELLER pursuant to this Paragraph 3.1(b) shall be five percent (5%) of the gross receipts from the sale or rental of the RBOP'S (excluding receipts from the sale or rental of prototype.)

Subsequent to the execution of the above agreement, a dispute arose between

Torus and Folsom. That dispute was described by the court of appeals as follows:

A dispute arose between Torus and Folsom concerning the method of calculating the annual royalty payments to be made to Torus over ten years. Torus sued Folsom for an accounting and for unpaid royalties.

113 F.3d at 213. As a result, they entered into a settlement agreement that, among

other provisions, contained a substitute for Paragraph 3.1(b) of the original sales

agreement. The new Paragraph provides as follows:

3.1(b)    In addition to the One Hundred Thousand Dollars ($100,000.00) paid Seller pursuant to Paragraph 3.1(a) hereof, Purchaser further agrees to pay to Seller, for a period of ten (10) years from the date of delivery of the first RBOP for sale or rental by Purchaser, an additional sum (in United States Dollars) determined as follows:

(i)    A sum equal to five percent (5%) of Purchaser's Gross Receipts from the sale or rental of the RBOPs. For all purposes in this Agreement, "Gross Receipts from the sale or rental of the RBOPs" shall mean all sums actually received by Purchaser for the sale of any RBOPs, and all sums actually received by Purchaser for the rental of any RBOPs, and shall specifically include all sums received for the sale or rental of any RBOP designated as a Prototype by Purchaser, but shall specifically exclude all sums received by Purchaser for service in connection with the sale or rental of RBOPs, mobilization fees in connection with the sale or rental of RBOPs, sums received for the sale of parts in connection with the sale or rental of RBOPs, and any and all other sums received by Purchaser in connection with the sale or rental of RBOPs; and

(ii)    In the event the Gross Receipts from the sale or rental of the RBOPs shall, for any calendar quarter, be less than thirty percent (30%) of the Total Receipts from the RBOPs, then, and in that event, in addition to the payment provided for in Paragraph 3.1(b)(i) above, Folsom shall pay to Torus, a sum equal to five percent (5%) of the amount by which the Total Receipts from the RBOPs less the Gross Receipts from the sale or rental of the RBOPs, exceeds seventy percent (70%) of the Total receipts from the RBOPs. For all purposes in this Agreement, "Total Receipts from the sale or rental of the RBOPs" shall mean the Gross Receipts from the sale or rental of the RBOPs, sums received by Purchaser for service in connection with the sale or rental of RBOPs, mobilization fees in connection with the sale or rental of RBOPs, sums received for the sale of parts in connection with the sale or rental of

20

RBOPs, and any and all other sums received by Purchaser in connection with the sale or rental of RBOPs.

The original sales agreement between Torus and Folsom contained a

provision authorizing each of them to transfer their interest in the contract.

13.3 Assignment. PURCHASER and SELLER are each expressly authorized to transfer their respective rights, title and interest hereunder by way of an assignment or otherwise, as either party deems appropriate, in connection with a sale of their respective business or substantially all of their respective assets, or otherwise.

The original sales agreement also contains a section outlining events

that would constitute a default under the contract and also the remedies available

upon default.

10.1 Material default by either party may include, but is not limited to:

* * * *

(b) Either party ceases to do business, becomes commercially insolvent, or is placed in receivership, or is declared by a competent court to be insolvent or bankrupt.

* * * *

(c) failure to pay the money due SELLER pursuant to the terms of this Agreement.

* * * *

10.5 In the event of a breach or a material default of this agreement by PURCHASER, in addition to recovery of any damages which may

be proven, SELLER shall also be entitled to recover reasonable attorney fees and court costs.

In the dispute between Torus and Folsom, two areas of uncertainty are presented. The first concerns Folsom's continuing liability for royalties in spite of its sale to RBOP Tools of all of the RBOP units it owned and the rights to sell or rent any newly manufactured RBOP units. Folsom argues that the new Paragraph 3.1(b)(i) means that it is only obligated to pay royalties on sums it actually receives for the sale or rental of RBOP units. Since it will no longer receive revenues from the sale or rental of RBOP units, it argues it owes no continuing obligation to Torus. The second uncertainty involves the apparently contradictory provisions of the sales agreement—Paragraph 13.3, which apparently authorizes Folsom to transfer its rights relating to the RBOP in connection with the sale of its business, and Paragraph 10.1(b), which provides that ceasing to do business constitutes a material default.[5]

In construing written contracts, a court should attempt to interpret the various provisions in a harmonious fashion.

---

[5] The court has considered the proffered parol evidence concerning this apparent ambiguity and concludes that none is admissible. Because other grounds clearly demonstrate that Folsom is in default, the court finds it unnecessary to reach this question of contract interpretation.

In reviewing contracts this Court seeks to accord them a reasonable construction under the terms used by the parties who made them, and when the contracts contain several provisions, all are construed together so that a harmonious operation can be given to each provision as far as the language used will permit.

United States Fid. & Guar. Co. v. Jacksonville, 357 So.2d 952, 955 (Ala. 1978).

The rules for construing written contracts have been stated as follows:

It is well established that, when courts are called upon to construe a writing, the plain and clear meaning of its terms must be given effect. Likewise, the parties must be legally presumed to have intended what is plainly and clearly set out in the writing. In determining the intent expressed in a writing, courts must look to the writing as a whole and to its nature, purpose, and subject matter. An ambiguity does not exist unless the instrument is reasonably susceptible to more than one meaning. However, if only one reasonable meaning clearly emerges, the writing is unambiguous.

Blue Cross and Blue Shield of Ala. v. Beck, 523 So. 2d 121, 124 (Ala. Civ. App. 1988)(citations omitted). Therefore, this court must look to the written contract documents as a whole, and then attempt to construe the various provisions harmoniously and reasonably in light of their nature, purpose and subject matter.

The broad underlying purpose of the contract between Torus and Folsom that emerges from a review of it in its entirety, is that it represented a sale of the RBOP technology to Folsom for an up front sum plus a royalty due upon the sale or rental of each unit. Paragraph 3.1(a) provides for the up front sum, and 3.1(b) sets forth the formula for computing the royalty. Paragraph 3.1(b) of the

settlement agreement must be read in light of Paragraph 3.1(b) of the original sales

agreement. In the original sales agreement, 3.1(b) begins as follows:

> In addition to the One Hundred Thousand Dollars ($100,000) paid
> SELLER pursuant to 3.1(a) hereof, PURHCASER [sic] further agrees
> to pay SELLER for a period of 10 years from the date of delivery of
> first RBOP for sale or rental by PURCHASER an additional sum of
> money (in U.S. Dollars) wherein such additional sum shall be
> determined by . . . .

Following this provision is a complex formula for determining the amount of the

"additional sum." In the settlement agreement 3.1(b) begins with virtually

identical language:

> In addition to the One Hundred Thousand Dollars ($100,000.00) paid
> Seller pursuant to Paragraph 3.1(a) hereof, Purchaser further agrees to
> pay to Seller, for a period of ten (10) years from the date of delivery
> of the first RBOP for sale or rental by Purchaser, an additional sum
> (in United States Dollars) determined as follows:

Therefore, both provisions begin with an unconditional agreement to pay an

"additional sum" or royalty for a period of ten years. Only the method of

computing that royalty is changed.

In the original sales contract, the formula is computed by

"multiplying the gross receipts from the sale or rental of the RBOP'S . . . by one-

half (1/2) of the Net Profit Percentage . . . ." In the settlement agreement, a new

subparagraph, 3.1(b)(i), is added, which sets out the formula for computing the

24

royalty. Under that formula, the royalty would equal 5% of "Purchaser's Gross Receipts from the sale or rental of the RBOPs." The phrase "Purchaser's Gross Receipts from the sale or rental of the RBOPs" is then defined to mean "all sums actually received by Purchaser for the sale of any RBOPs, and all sums actually received by Purchaser for the rental of any RBOPs . . . ." It is based upon this language that Folsom argues that it owes nothing more than 5% of the $2,100,000 as it is received. It is clear that if the original formula for computing the royalty remained in effect, Folsom would continue to owe the royalty. That provision only refers to sales or rentals of RBOP units, without reference to who sold or rented those units. However, the wording of the substitute Paragraph refers to "Purchaser's Gross Receipts" and "all sums actually received by Purchaser for the sale of any RBOP." When the purpose and subject matter of that clause is considered, it becomes clear that the language used was not intended to limit Folsom's obligation to pay a royalty for a period of ten years. Subparagraphs 3.1(b)(i) and (ii) are intended merely to set out the formula for determining the amount of the royalty due. An agreement by Torus and Folsom that Folsom would no longer be liable for royalty payments should it sell its entire interest in the RBOP business would logically be included either in the first portion of Paragraph 3.1(b), which establishes the obligation to pay a royalty for ten years, or

25

in Paragraph 13.3, which concerns the assignment of the contract rights. It is more reasonable to conclude that the use of the phrase "all sums actually received by Purchaser for the sale of any RBOP" was perhaps used in an attempt to clarify that Folsom would not be liable for a royalty payment unless it actually received payment from the purchaser of the RBOP.

To interpret Paragraph 3.1(b)(i) in the fashion suggested by Folsom would render meaningless the immediately preceding unconditional obligation to pay a royalty for a period of ten years. In order to give a harmonious meaning to the contract as a whole, "Purchaser," as it is used in Paragraph 3.1(b)(i), must be interpreted to mean "purchaser or its assignee." Otherwise, a technical application of the formula would frustrate the clear purpose of the contract—that Torus would receive a royalty upon the sale or rental of each RBOP unit for a period of ten years. Therefore, "purchaser" must be read to mean RBOP Tools in the formula for computing the amount of the royalty. Torus is thus entitled to receive from Folsom the amount specified by the formula set out in Paragraph 3.1(b) upon the sale or rental of each RBOP unit by RBOP Tools. Therefore, the court will require RBOP Tools to account to Torus for its sales and rentals in the manner provided for by article nine of the settlement agreement, which replaced the original accounting provision contained in the sales agreement.

This interpretation is also required in order to preserve a reasonable interpretation of the provision in the contract allowing the parties to assign their respective rights. The purpose of Paragraph 13.3 was to specify the conditions under which the parties could transfer their respective interests under the contract. Paragraph 13.3 only authorizes Folsom and Torus to "transfer their respective rights, title and interest hereunder . . . ." It says nothing of extinguishing Folsom's obligations under the contract upon such assignment of rights, and it is axiomatic that a party to a contract may not extinguish its duties merely by assigning its rights. If the parties had agreed that Folsom would be relieved of its obligations under the contract merely by selling its entire interest in the RBOP business, Paragraph 13.3 would logically recite that fact. To interpret Paragraph 3.1 as suggested by Folsom would frustrate the clear intent of Paragraph 13.3 and the purpose of the contract as a whole.

The payment of royalties is not the only obligation imposed by the sales agreement. Paragraph 3.2 of the sales agreement between Folsom and Torus provides in part that the "PURCHASER [Folsom] agrees to purchase from SELLER [Torus] all of the elastomer products required in the manufacture or repair of the RBOP'S sold or rented by PURCHASER." This portion of the sales agreement was modified on February 11, 1991, by the "Packer Agreement." That

agreement made certain changes to Paragraph 3.2 concerning one of the three types of packers which Folsom agreed to purchase from Torus, but in other respects, the sales agreement was to remain in effect. As with the royalty provision of the contract, "purchaser" must in this context be read to mean RBOP Tools and Folsom remains obligated to assure that the terms of the Packer Agreement are complied with. RBOP Tools must, therefore, provide an accounting to Torus in order to allow Torus to determine if it has been damaged because of Folsom's breach of the Packer Agreement.

For these reasons, the court determines that Folsom remains obligated to pay Torus a royalty for the remainder of the ten year period. That royalty is to be determined based upon the formula given in Paragraph 3.1(b), substituting RBOP Tools for "purchaser" or "Folsom" as context requires. Only in this manner may the ultimate purpose of the contract—providing Torus with a royalty upon each sale or rental of an RBOP unit for a period of ten years—be given effect. The same applies with respect to the Packer Agreement and any other obligation imposed upon Folsom by the sales agreement.

## III.

## FOLSOM IS IN DEFAULT

Paragraph 10.1(c) provides that "failure to pay the money due SELLER pursuant to the terms of this Agreement" constitutes a material default. It is not disputed that Folsom has failed to pay Torus the royalties due under the terms of the contract. As noted above, the contract requires that Folsom pay Torus a royalty each time an RBOP unit is sold or leased, regardless of whether it is sold by Folsom, RBOP Tools, or any other entity acquiring the rights to the RBOP through the original sales agreement from Torus to Folsom. Additionally, Folsom acknowledges that it retained all obligations under the contract when it sold the RBOP business to RBOP Tools. (Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment at p. 23 ("Folsom did not transfer its obligations under the Agreements to Big D. To the contrary, Plaintiff Folsom explicitly retained such obligations.").)

Paragraph 10.2 of the sales agreement provides that a party shall have 60 days to cure any breach or default under the agreement after being notified in writing of the breach. In the letter from Torus's attorney, Michael E. Krasnow, wherein he rejected Folsom's tender of the sums Torus contended it owed, is the following:

We return the check because the tendered payment is improper
pursuant to the Agreement between Seal-Tech, a Division of Folsom
Metal Products, Inc., and Torus Equipment, Inc. executed on behalf
of Seal-Tech on February 2, 1990, as said Agreement has been
amended.

\* \* \* \*

The Settlement Agreement that was entered into on February 15,
1993, amended and changed the method or formula for computing the
additional sum, but did not alter the obligation that such sum be paid
for ten years.

\* \* \* \*

We do believe, however, that there is a continuing obligation due
Torus, to pay the additional sum for the remainder of the ten year
period. Because of this, we reject the tendered $8,750.00 payment.

(Def.'s brief in support of motion for summary judgment, Exhibit G.) This letter

served to notify Folsom that Torus considered this an anticipatory breach of the

contract and thereby Folsom was in default under the agreement. Folsom did not

cure the default within the specified 60 day period. Therefore, Torus is entitled to

recover in addition to any damages proven, reasonable attorney fees and court

costs under Paragraph 10.5 of the sales agreement.

30

## IV.

## THE LIABILITY OF RBOP TOOLS TO TORUS

A.     RBOP TOOLS IS NOT LIABLE UNDER CONTRACT LAW FOR
       THE PAYMENT OF CONTINUING ROYALTIES.

Torus seeks a declaration that RBOP Tools is liable under the

contract between Torus and Folsom.  The parties have devoted most of their

attention to the royalty provision of the sales agreement.  However, the issue of

whether RBOP Tools is obligated to purchase packers from Torus under the terms

of that agreement is also presented.

Torus bases it claims against RBOP Tools upon an implied

assumption of the obligations of the contract by RBOP Tools, which Torus argues

arose when RBOP Tools purchased the RBOP business from Folsom.  Torus

argues that Meighan v. Watts Construction Co., 475 So. 2d 829 (Ala. 1985),

supports its position.  In Meighan, the court apparently adopted the holding of

Rose v. Vulcan Materials Co., 282 N.C. 643, 194 S.E. 2d 521 (1973).  A careful

review of Rose indicates that it is inapplicable to the facts of the instant case.

In Rose the court was faced with the question of whether the assignee

of an executory bilateral contract who "purchased the assets and obligations" of

31

the assignor should be liable for the nonperformance of the assignor's duties under

that contract. The court noted that under the majority rule

> [T]he assignee of an executory bilateral contract is not liable to
> anyone for the nonperformance of the assignor's duties thereunder
> unless he expressly promises his assignor or the other contracting
> party to perform, or 'assume' such duties. These states refuse to
> *imply* a promise to perform the duties, but if the assignee expressly
> promises his assignor to perform, he is liable to the other contracting
> party on a third-party beneficiary theory. And, if the assignee makes
> such a promise directly to the other contracting party upon a
> consideration, of course he is liable to him thereunder.

194 S.E. 2d at 533 (citations omitted). The court then set forth the minority rule:

> A minority of states holds that the assignee of an executory bilateral
> contract under a general assignment becomes not only assignee of the
> rights of the assignor but also delegatee of his duties; and that, <u>absent
> a showing of contrary intent</u>, the assignee impliedly promises the
> assignor that he will perform the duties so delegated.

194 S.E. 2d at 533 (original emphasis deleted)(emphasis added). The court noted

that this rule was expressed in Restatement, Contracts, § 164 (1932) as follows:

> (1) Where a party under a bilateral contract which is at the
> time wholly or partially executory on both sides purports to
> assign the whole contract, his action is interpreted, <u>in the
> absence of circumstances showing a contrary intention</u>, as an
> assignment of the assignor's rights under the contract and a
> delegation of the performance of the assignor's duties.
>
> (2) Acceptance by the assignee of such an assignment is
> interpreted, <u>in the absence of circumstances showing a contrary
> intention</u>, as both an assent to become an assignee of the

assignor's rights and as a promise to the assignor to assume the performance of the assignor's duties.

194 S.E. 2d at 533 (original emphasis deleted)(emphasis added). The Rose court adopted this rule and further held that "the other party to the original contract may sue the assignee as a third-party beneficiary of his promise of performance which he impliedly makes to his assignor, under the rule above laid down by accepting the general assignment." 194 S.E. 2d at 534.

It is clear from the above that an implied promise to assume the assignee's duties will only arise if there are no circumstances showing a contrary intention. It is also important to note that any implied promise or implied delegation of duties arises between the assignor and assignee. In the instant case RBOP Tools[6] asserts that it clearly expressed an intention not to assume the duties under the contract between Folsom and Torus. The "Termination Agreement and Asset Purchase Agreement"[7] between Folsom and RBOP Tools contains various

---

[6] Again, the court will refer only to RBOP Tools even though it was one of its predecessors that actually purchased the RBOP business.

[7] The contract for the sale of the RBOP business by Folsom to RBOP Tools consists of several documents. There was an offer to purchase certain assets dated February 22, 1994, made by the predecessor of RBOP Tools. This offer was accepted by a letter from Folsom dated February 24, 1994. That agreement was incorporated into the "Termination Agreement and Asset Purchase Agreement." (continued...)

provisions that indicate RBOP Tools did not intend to assume the obligations
under the sales contract between Folsom and Torus. Paragraph 5.2 of the
termination agreement provides in part as follows:

> [Folsom] expressly acknowledges that [RBOP Tools] shall in no way
> be responsible for any, nor shall it assume, any liabilities associated
> with the Business [a defined term] or the Assets [a defined term]
> existing as of or arising before the Closing Date, all of which
> liabilities shall be for the sole account of [Folsom] and [Folsom]
> hereby agrees to indemnify and save [RBOP Tools] harmless from
> any and all such liabilities whatsoever.

Paragraph 9.1(f) provides:

> there are no royalties, license fees, liens or charges or any other
> encumbrances of any kind whatsoever in favour of any third party
> claiming by, through or under [Folsom] in respect of the Assets.

These excerpts clearly indicate that RBOP Tools did not intend to make an
implied promise that it would pay royalties to Torus. Together they clearly
indicate an intention not to assume other obligations under the contract between
Torus and Folsom. There is no contradictory evidence in the record. In fact,
Folsom, the party to whom any implied promise would run, insists that it did not
assign its obligations under the agreement to the predecessor of RBOP Tools.

---

[7](...continued)
Hereinafter these various documents will be referred to collectively as
"termination agreement."

34

(Pl.'s Mem. Supp. Sum. J, at pp. 20 ("Plaintiff Folsom did not assign to Big D its obligations to pay royalties under the Agreements."), p. 23 ("Folsom did not transfer its obligations under the Agreements to Big D.").) Therefore, the record clearly demonstrates the presence of circumstances that would negate any implied assumption of the duties owed by Folsom to Torus under the sales contract. No implied promise or assumption can arise when the parties to the transaction so clearly indicated that no such promise or assumption was intended. There exists no genuine issue of fact on this point. Therefore, the <u>Meighan</u> case is inapplicable to the facts of this case.

B.    RBOP TOOLS IS NOT LIABLE UNDER TRADITIONAL CORPORATE LAW SUCCESSORSHIP DOCTRINES.

This case does not involve the application of corporate law or products liability law concepts of successorship. Torus has acknowledged this point: "Both the <u>Colonial Bank</u> and the <u>Rivers</u> cases, one a product liability case and the other using corporation law, are inapplicable to this case, as an implied assumption of obligations under a contract, which has occurred here, is a separate doctrine of law." (Def.'s Reply Brief at p. 7.) The court is of like mind. No evidence in the record suggests the presence of any of the factors relevant to the successorship doctrine in those areas of law.

35

C.  EVEN THOUGH RBOP TOOLS IS NOT LIABLE TO TORUS
UNDER THE SALES AGREEMENT BETWEEN FOLSOM AND
TORUS, IF IT ASSERTS RIGHTS UNDER THAT AGREEMENT,
THE OBLIGATIONS OF THAT AGREEMENT MUST BE
FULFILLED.

Although RBOP Tools is not liable to Torus under the sales

agreement, its rights under that agreement are subject to the performance of the

duties imposed thereunder.

> Such an assignment ordinarily does not impose on the assignee the
> personal duty to fulfill the obligations imposed by the contract on his
> assignor.  But if he brings action on the instrument his right is limited
> by the burdens and obligations which his assignor thereby assumed.

Loegler v. C.V. Hill & Co., 238 Ala. 606, 193 So. 120, 121 (1940).  Therefore, if

RBOP Tools wishes to enjoy the benefits of the Torus to Folsom sales contract, it

must ensure that the obligations arising under that contract, including the

obligation to pay royalties, are fulfilled.  This rule was recognized in McGill v.

Baker, 147 Wash. 394, 266 P. 138 (1928), a case cited both by Loegler and the

Rose court.  In McGill, the court in discussing the general rule that held an

assignee did not automatically assume the duties of his assignor, noted that the

assignee takes the rights afforded by the contract subject to the burdens imposed.

> But on the other hand, it is held that the assignee of a contract, who
> acquires the right to enforce the executory provisions thereof or to
> recover damages for the breach, assumes the burdens which are

36

imposed upon the assignor by the contract as the consideration for the performance by the other party.

266 P. at 140 (quoting 5 Corpus Juris, 976, § 169).

But it is not to be inferred from this that the assignee of a contract may enforce it without the performance of the obligations which it imposes. On the contrary, he takes the right with all the burdens to which it was subject in the hands of the assignor, and if he undertakes to enforce the right by an action, he must show that the conditions have been performed either by his assignor or himself.

266 P. at 141 (quoting 2 R.C.L. 565).

Application of the above rule to the present case demonstrates that if RBOP Tools wishes to enjoy the rights to the RBOP business granted by the Torus to Folsom sales agreement, it must ensure that the burdens imposed upon Folsom by that agreement are fulfilled. Specifically, RBOP Tools must pay the royalties due upon the sale or rental of each RBOP unit if Folsom does not. Additionally, the terms of the Packer Agreement must be complied with. Because Folsom is directly liable to Torus for the royalty payments and for the conditions imposed by the Packer Agreement, RBOP Tools must furnish the accounting required by Article 9 of the sales agreement as amended by the settlement agreement, as well as any other information necessary in order for Torus to ensure that the burdens imposed upon Folsom by the sales agreement as amended are fulfilled. RBOP

Tools may not reap the benefits of the Torus to Folsom sales agreement without ensuring that its obligations are met.

## V.

## RBOP TOOLS IS ENTITLED TO INDEMNIFICATION FROM FOLSOM

A.  FOLSOM BREACHED ITS WARRANTY TO RBOP TOOLS AND RBOP TOOLS IS ENTITLED TO RECOVER DAMAGES FOR THAT BREACH.

The general rule regarding damages for the breach of a contract in Alabama is that "[d]amages should return the injured party to the position he would have been in had the contract been fully performed." Garret v. Sun Plaza Development Co., 580 So. 2d 1317, 1320 ( Ala. 1991). "These damages are generally those that flow naturally from the breach." 580 So. 2d at 1320.

Folsom warranted to RBOP Tools that there were no "royalties . . . or any other encumbrances of any kind whatsoever in favour of any third party . . . ." Folsom also warranted that it had "full power and absolute authority to bargain, sell, transfer, assign and convey the Assets for the purposes, and in the manner, herein provided . . . ." Both of these warranties were unquestionably breached. Folsom did not have the right to sell the RBOP business free and clear of royalties or the conditions imposed by the Packer Agreement. RBOP is thus entitled to

38

recover from Folsom damages sufficient to return it to the position it would have

been in had these warranties been fulfilled. If RBOP pays royalties to Torus, it is

entitled to recover those sums from Folsom. If RBOP is required by Torus to

purchase packers subject to the terms of the Packer Agreement, RBOP Tools will

be entitled to recover any losses arising therefrom. In addition, RBOP Tools is

entitled to recover the costs associated with the accounting, which it is required to

make to Torus.

### B. RBOP TOOLS MIGHT BE ENTITLED TO RECOVER ATTORNEY'S FEES UNDER AN EXCEPTION TO THE GENERAL RULE.

RBOP Tools might be able to recover attorney's fees and other

expenses incurred in prosecuting the present lawsuit against Torus. The exception

to the general rule that appears to be applicable to the instant case was set forth in

Highlands Underwriters Insurance Co. v. Elegante Inns, Inc. as follows:

> [I] is generally recognized that where the natural and proximate consequences of the defendant's wrongful act causes the plaintiff to become involved in litigation with a third person, attorneys' fees and other expenses incurred in such litigation may be recovered as damages.

361 So. 2d 1060, 1066 (Ala. 1978). Although Elegante Inns involved a tortious

breach of duty, the rule also applies to breaches of contractual duties. First Ala.

39

Bank v. First State Ins. Co., Inc., 899 F.2d 1045, 1070 (11th Cir. 1990) (citing

George E. Jensen Contractor, Inc. v. Quality Mill Works, 431 So. 2d 1232, 1234

(Ala. 1983).

In the present action it appears that Torus and RBOP Tools have

become embroiled in a lawsuit as a result of Folsom's breach of the warranties

contained in the termination agreement. RBOP Tools has sought "such other,

further and different relief as the court may deem appropriate." (Pretrial Order

entered June 19, 1996 [Dkt # 35]). However, the court is of the opinion that the

matter should be adequately briefed and a proper record developed before

awarding attorney's fees to RBOP Tools under this exception to the general rule.

Upon motion the court will allow a modification of the pretrial order to clarify that

RBOP Tools seeks to recover the attorney's fees and other costs associated with

its action against Torus, and will set up a briefing schedule on that issue.

## VI.

## CONCLUSION

The contract documents evidencing the sale of the RBOP business

from Torus to Folsom represent a complete integration of the parties' agreement

with respect to the subject matters contained therein. None of the proffered parol

evidence is admissible. Therefore, the interpretation of the sales agreement must come from the written contract documents, and as such is a question of law. Pursuant to the terms of the sales agreement, Folsom remains obligated to pay royalties for the remainder of the ten-year period according to the terms of the sales agreement. Folsom also remains liable for the performance of the terms of the Packer Agreement. RBOP Tools must furnish Torus an appropriate accounting in order to allow these liabilities to be computed.

Folsom is in default under the terms of the sales agreement because of its refusal to pay royalties to Torus upon the sale or rental of RBOP units by RBOP Tools. According to the terms of the sales agreement, Torus is entitled to recover attorney's fees and costs under the terms of Paragraph 10.5 of the sales agreement.

RBOP Tools is not liable to Torus for the obligations imposed on Folsom by the sales agreement. However, if it wishes to enjoy the benefits afforded by the Torus to Folsom sales agreement, it must ensure that the duties imposed by that agreement are fulfilled, either by Folsom or itself.

RBOP Tools is entitled to indemnification from Folsom for any damages due to Folsom's breach of the warranties contained in the termination

41

agreement. These damages include any royalties it is required to pay to Torus because of Folsom's refusal to pay the same and any other damages arising because it is required to ensure that the obligations of the sales agreement are met. RBOP Tools might also be entitled to recover its attorney's fees incurred against Torus from Folsom under an exception to the general rule. RBOP Tools will be afforded an opportunity to move to amend the pretrial order to make it clear it seeks to recover such fees and the court will then establish a briefing schedule on that issue.

An appropriate order will be entered contemporaneously herewith.

DONE this 2nd day of September 1998.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.