F·I·L·E·D

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 SEP -2  PM 3: 10

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| FOLSOM METAL PRODUCTS, INC., an Alabama corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION NO. 94-G-0988-S |
| TORUS EQUIPMENT COMPANY, | ) ) ) |
| Defendant. | ) ) |
| =============== | ) ) |
| RBOP TOOLS INTERNATIONAL, INC., a Texas corporation, | ) ) ) |
| Intervenor-plaintiff. | ) |

**ENTERED**
**SEP  2 1999** *asl*

*******************************   CONSOLIDATED WITH:

| | |
|---|---|
| FOLSOM METAL PRODUCTS, INC., | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| RBOP TOOLS INTERNATIONAL, INC., | ) CIVIL ACTION NO. 99-G-0003-S ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

### I.
### INTRODUCTION

This cause is before the court upon various motions filed in the above

consolidated actions.  The original action pending before this court, Folsom Metal

Products, Inc. v. Torus Equipment Company, CV 94-G-0988-S ( "Folsom I") has

91

been consolidated with a related case, Folsom Metal Products, Inc. v. RBOP Tools International, Inc., CV 99-G-0003-S ("Folsom II".) The motions in Folsom I were prompted by the court's earlier order and opinion in that action [Docs. # 64 and # 65]. The factual background of Folsom I was summarized in that opinion and will not be restated here.[1] On December 4, 1999, Folsom filed Folsom II in state court and the action was subsequently removed to this court. The action seeks to collect on the promissory note executed by RBOP Tools' predecessor in connection with the sale of the RBOP business by Folsom in 1994.[2]

## THE MOTIONS IN FOLSOM I

In Folsom I, RBOP Oil Tools International, Inc. ("RBOP Tools") has filed motions to amend the pretrial order. [Doc. # 67] The first part of that motion

---

[1] The court will attempt to utilize the same terminology and short-hand reference system employed in that opinion. Therefore, the "hereinafter" references utilized in that opinion may be employed in the present opinion without further notation. One exception will be that the court will not refer to the sums due Torus upon the sale or rental of RBOP units as "royalties." The use of that term connotes certain legal consequences that might or might not attach to the particular fact situation at hand. The court will refer to these as the "Additional Amount." This will be addressed in more detail below.

[2] The court notes that Folsom's filing of the state court action appears to be an attempt to undermine this court's ability to rule on the pending motions in Folsom I relating to interpleader and payment of sums due on the promissory note into the registry of court. Judicial economy would certainly have better been served by filing a counterclaim in Folsom I.

2

seeks to amend the pretrial order[3] to clarify that it seeks to recover attorneys fees from Folsom Metal Products, Inc. ("Folsom").[4]  The second part of that motion seeks to amend the PTO to clarify RBOP Tools' previous claim in the nature of a right of set-off asserted against both Folsom and Torus Equipment Company, Inc. ("Torus").[5]

---

[3]  Several pretrial orders have been entered. General references to "the pretrial order" will be to the "Amended Order on Pretrial Hearing," entered June 19, 1996, [Doc. # 35] which has been deemed by the court to have superseded any prior pretrial orders (See "Amendment to Order on Pretrial Hearing" [Doc. # 47]). It thus contains the presently controlling statement of the parties claims and defenses.

[4]  RBOP Tools' motion contains an obvious clerical error on page four of the motion wherein it seeks to amend the pretrial order "to clarify that RBOP Tools seeks recovery from Torus for its attorney's fees . . . ."  The motion obviously seeks to assert such claim against Folsom, rather than Torus, and the court will interpret it thus.

[5]  RPOP Tools' complaint in intervention contains a cross-claim for indemnification from Folsom and also seeks a declaration that payment into the registry of the court of the sums due Folsom on the promissory note made in connection with the Folsom to RBOP Tools sale "shall not be grounds for default on the part of RBOP Tools." ("Complaint in Intervention" at p. 5-6, [Doc. # 20].)

RBOP Tools has filed a motion to interplead funds.[6]  In essence RBOP Tools asserts that the only asset of Folsom available to pay the sums due Torus is the promissory note it holds from RBOP Tools.  It argues that to allow Folsom to collect upon the note would subject RBOP Tools to the potential for double liability should Folsom not meet its obligations to Torus as outlined in this court's previous opinion and order.  RBOP Tools has also filed a motion for summary judgment on the issue of attorney's fees and its set-off claims.

Torus has filed a motion for leave to amend the pleadings in order to assert an equitable lien in the RBOP proprietary rights and any proceeds derived therefrom through the sale or rental of RBOP units.  That motion is based upon allegations that Folsom is insolvent and that the proceeds of the promissory note are removed from the corporation within a short time of their receipt. Torus has also filed a motion for leave to conduct discovery as to the solvency of Folsom should its requested amendment be allowed.

---

[6] RBOP Tools filed a motion to interplead on January 29, 1996.  The motion was overruled, after having been briefed, by stamped ruling on March 1, 1996.  All of this occurred long before the case was reassigned to the undersigned district judge following the previous appeal.  Since that ruling, the posture of the case has changed dramatically.  Folsom has not argued that the previous ruling prevents reconsideration of the issue.  Therefore, the court will review RBOP Tools' motion on the merits.

4

## THE MOTIONS IN FOLSOM II

In Folsom II, both Folsom and RBOP Tools have filed motions for summary judgment. In its motion for summary judgment, Folsom alleges that RBOP Tools has not made payments due under the terms of the promissory note. RBOP Tools' cross motion for summary judgment asserts that Folsom breached the warranties and covenants contained in the termination agreement, thereby relieving RBOP Tools of is obligation to make payments under the promissory note.

## II.
## FOLSOM I

### THE NATURE OF THE SALE BY TORUS TO FOLSOM

The origin of this case lies in the sale by Torus to Folsom of certain assets, both tangible and intangible, in 1990. The contract by which that sale was accomplished began by noting that Torus possessed "certain proprietary rights, including but not limited to, Technical Know-How and Trade Secrets relating to a ROTATING BLOWOUT PREVENTER for use with oil field drilling apparatus . . . ." (Sales Agreement at p. 1.) Article two of that sales agreement provided that Torus agreed to sell, and Folsom agreed to buy "the entire right, title and interest in and to [Torus's] proprietary rights relating to the RBOP, including

5

any Trade Secrets[7] and Technical Know-How[8] which may exist relating to the

RBOP . . . ." The sales agreement provided that Folsom would pay Torus the sum

of $100,000, plus an Additional Amount based upon the future sale or rental of

RBOP units for a period of ten years. It is this Additional Amount that is at the

heart of the parties' present dispute. The parties in their submissions, the court of

appeals, and this court in its previous opinion, have referred to this as a "royalty."

The court is concerned that calling these additional payments royalties might be

confusing. A royalty generally is a payment for the use of property, the ownership

of which remains with the party receiving the royalty payment. See Blacks Law

Dictionary 1330-31 (6th Ed. 1190). The use of the word royalty to describe these

additional payments might suggests legal consequences that may or may not apply

to the present case. Therefore, the court will refer to these payments as the

"Additional Amount."

---

[7] The sales agreement defines "Trade Secrets" as "all materials, information, drawings, documents, verbal communications, or other information of whatever nature disclosed by [Torus] to [Folsom] relating to the RBOP, provided that same is not generally, widely and publically known and disseminated." Article 1.4

[8] The sales agreement defines "Technical Know-How" as "[Torus's] confidential and/or proprietary information and expertise relating to the design and manufacture of the 'RBOP,' including, but not limited to, engineering drawings, specifications, processes, tools, gages, [sic] and manufacturing information and techniques." Article 1.2

In the present case, Torus sold both tangible assets and intangible assets, including trade secrets and know-how, to Folsom. Without question the transfer of these intangibles, including trade secrets relating to the RBOP technology, was the most important aspect of the sales agreement between Torus and Folsom. Trade secrets[9] are property and may be sold. See Earl W. Kintner & Jack Lahr, An Intellectual Property Law Primer 208 (2nd Ed. 1982)("Another aspect of trade secrets as property is that they may be assigned, that is, the right of them may be transferred from one party to another.") The owner of a trade secret may also grant another the right to use the trade secret via a license. There are important distinctions between these two methods of transferring trade secrets.

> The distinction between an assignment and a license is that the licensor keeps legal title, whereas the assignor relinquishes such title. Because one transferring trade secrets will usually want to retain legal title so that he still has control over the use of the trade secrets by others, licensing is a more common method of transfer than assignment . . . ."

Id. at 225. Licensing agreements commonly require a payment by the licensee based upon sales of a product produced through the use of the trade secret. Such a payment would properly be described as a royalty.

---

[9] In the following discussion the court will refer only to trade secrets, but the discussion also applies to the other intangible assets, including know-how, acquired by Folsom.

7

A provision requiring the purchaser of a trade secret to pay a sum based upon future sales does not convert a sale into a license. Although such payments are commonly associated with licensing arrangements, they may also constitute part of the purchase price in a straight sales transaction. See Grand Rapids Wood Finishing Co. v. Hatt, 152 Mich. 132, 115 N.W. 714 (1908)(contract for the sale of secret formulas for the manufacture of furniture polishes required payment of a percentage of net sales). In the present case, the Torus to Folsom sales agreement constituted a sale of the trade secrets and other intangibles. This is made crystal clear by Article 10.6 of the contract, which provides as follows:

> In the event [Folsom] fails to pay [Torus] the initial purchase price of Fifty Thousand Dollars for the first ten (10) RBOP's, then, in such event, [Folsom] agrees to transfer to [Torus] any and all rights, title and interest in and to the Technical Know-How, Trade Secrets . . . [Folsom] may have obtained under the terms of this Agreement . . . ."

Had Torus merely licensed the use of the trade secrets and know-how, there would be no need to provide that Folsom would be required to reconvey them in the event it failed to pay the initial purchase price.[10] That the sales agreement provided for an additional payment based upon future sales does not alter the nature of the Torus to Folsom sale of the RBOP trade secrets and know-

---

[10] There is no similar contract provision with respect to the Additional Amount portion of the purchase price.

8

how—Torus conveyed its property rights in those intangibles to Folsom. After the
execution of the sales agreement, it no longer retained a property interest in the
trade secrets conveyed. The right to receive the five percent Additional Amount is
a contract right, rather than a property right.[11] Also, because Torus retained no
security interest in the trade secrets conveyed, it is without the protections
afforded a secured creditor under the law of secured transactions.[12]

### THE NATURE OF RBOP TOOLS' S OBLIGATION TO TORUS

The sales agreement also created certain contract rights in Folsom's
favor. Among these was Torus's promise not to sell or reveal the RBOP trade
secrets to anyone else. When trade secrets are involved, the seller's contractual
promise not to reveal the secret to others is a very valuable right. Torus sold its
entire property interest in the trade secrets relating to the RBOP, and Folsom
subsequently sold the same to RBOP Tools. RBOP Tools argues vehemently that

---

[11] Torus' claim against RBOP Tools sounds exclusively in contract. Torus
has not asserted claims of trade secret misappropriation or interference with
contractual relations against RBOP Tools.

[12] The court has concluded that Torus has no vendor's lien under Alabama
law. See Stringfellow v. Ivie, 73 Ala. 209, 214 (1882)("The vendor of personal
property, parting with the possession, has no implied or equitable lien for the
payment of the purchase money—he must look alone to the personal responsibility
of the vendee."). This does not, however, mean that other equitable remedies are
unavailable to Torus.

the Termination Agreement by which it acquired the RBOP business from Folsom
did not constitute an assignment of contract rights under the Torus to Folsom sales
agreement.  It cannot be questioned, however, that whatever property rights in the
RBOP trade secrets and know-how RBOP Tools acquired from Folsom, were
acquired by Folsom through the sales agreement with Torus.

In addition to the property rights conveyed, the termination agreement
also transferred "all other assets . . . relating to the Business . . . ."  (Termination
Agreement at ¶ 1.1(l).)  This would have included any contract rights under the
Torus to Folsom sales agreement.  Although RBOP Tools argues in brief that the
Torus to Folsom sales agreement was not executory, clearly this is not the case.
The sales agreement contains several continuing obligations on the part of Torus.
Among those are the following:

> 7.1   [Torus] and [Folsom] agree that all Technical Know-How and
> Trade Secrets furnished by [Torus] to [Folsom] pursuant to the terms
> of this Agreement will be kept in confidence.
>
> * * *
>
> [Torus] acknowledges that absolute confidence is necessary so
> that exclusive rights will remain in [Folsom] and, accordingly,
> [Torus] will use its best effort and due care to assure that no
> Technical Know-How, Trade Secrets, plans, drawings, or
> specifications or other information about the RBOP are divulged to
> third parties.

     7.2    [Torus] agrees to maintain the confidence of the Technical
Know-How and Trade Secrets during the term of this Agreement.

In Article 7.3 Torus agrees not to sell any of the RBOP trade secrets or know-how

to others and in Article 7.4 promises not to compete with Folsom. These are

clearly valuable executory contractual obligations on the part of Torus and if

RBOP Tools wishes to enjoy the benefits of these contractual obligations, it must

ensure that the burdens imposed upon Folsom by the Torus to Folsom sales

agreement are fulfilled. In the court's prior opinion, it was these rights which the

court had in mind when it stated that "if RBOP Tools wishes to enjoy the rights to

the RBOP business granted by the Torus to Folsom sales agreement, it must

ensure that the burdens imposed upon Folsom by that agreement are fulfilled."

(Memorandum Opinion [Doc. # 65] at 37.) That Torus viewed the contract as

executory is made clear by its alternate request for relief. In the pretrial order, as

an alternative to recovery of the Additional Amount, Torus seeks a declaration that

the sales agreement "is terminated and Torus is relieved of all obligations under

the agreement, including its obligation not to compete." (Amended Order on

Pretrial Hearing, Doc. # 35.) Clearly the sales agreement remains executory in

important respects. Surely RBOP Tools would argue the contract was executory if

Torus sold the RBOP trade secrets and know-how to one of RBOP Tools'

11

> 7.2    [Torus] agrees to maintain the confidence of the Technical
> Know-How and Trade Secrets during the term of this Agreement.

In Article 7.3 Torus agrees not to sell any of the RBOP trade secrets or know-how

to others and in Article 7.4 promises not to compete with Folsom.  These are

clearly valuable executory contractual obligations on the part of Torus and if

RBOP Tools wishes to enjoy the benefits of these contractual obligations, it must

ensure that the burdens imposed upon Folsom by the Torus to Folsom sales

agreement are fulfilled.  In the court's prior opinion, it was these rights which the

court had in mind when it stated that "if RBOP Tools wishes to enjoy the rights to

the RBOP business granted by the Torus to Folsom sales agreement, it must

ensure that the burdens imposed upon Folsom by that agreement are fulfilled."

(Memorandum Opinion [Doc. # 65] at 37.)  That Torus viewed the contract as

executory is made clear by its alternate request for relief.  In the pretrial order, as

an alternative to recovery of the Additional Amount, Torus seeks a declaration that

the sales agreement "is terminated and Torus is relieved of all obligations under

the agreement, including its obligation not to compete."  (Amended Order on

Pretrial Hearing, Doc. # 35.)  Clearly the sales agreement remains executory in

important respects.  Surely RBOP Tools would argue the contract was executory if

Torus sold the RBOP trade secrets and know-how to one of RBOP Tools'

competitors. RBOP Tools may enjoy the benefits of these continuing obligations
of Torus only if Torus is paid the Additional Amount.

### RBOP TOOLS' SETOFF CLAIMS, REQUEST TO PAY FUNDS INTO COURT AND MOTION TO INTERPLEAD FUNDS

RBOP Tools' motion to interplead funds is again due to be denied.
RBOP Tools is not a disinterested stakeholder holding a single fund, the
ownership of which is in doubt. RBOP Tools' liability to Folsom is on the
promissory note. Its potential liability to Torus is unrelated to that liability and,
therefore, interpleader is not appropriate. This is not to say, however, that RBOP
Tools is not entitled to any relief.

RBOP Tools seeks, in the nature of a set-off, a declaration that its
obligations to Folsom will be satisfied by paying the sums due and owing to
Folsom into the registry of the court, or such other interest bearing account as the
court may direct —such funds being held for the benefit of the party ultimately to
be determined by the court to be entitled to the same. RBOP Tools also requests
that the pretrial order be amended to clarify RBOP Tools' claim that "payment in
such manner as directed by the Court shall not be grounds for default on the part
of RBOP Tools."[13] The amended order on pretrial hearing entered June 19, 1996,

---

[13] Folsom, in spite of the pending motions in Folsom I, filed Folsom II in
(continued...)

12

asserted the following cross-claim for declaratory relief: "RBOP Tools' obligation to Folsom shall be satisfied by the timely payment by RBOP Tools into the registry of the court or into such other interest bearing account as may be directed by the court, of sums as they become due and owing to Folsom, to be held in escrow for the benefit of such party as may be ordered by the court, and that payment in such manner as directed by the court shall not be grounds for default on the part of RBOP Tools." (Amended Order on Pretrial Hearing [Doc. # 35].)

The equitable relief of setoff is available to prevent injustice in the proper case.

> A court has inherent equitable power to allow or compel a setoff whenever equity and justice so demand. The right of setoff itself is essentially an equitable right, which courts may enforce at their discretion. . . . Equitable setoff may be enforced independently of setoff statutes, if, from the nature of the claim or the situation of the parties, it is impossible to obtain justice by plea or cross action. This occurs when the defendant, through no fault of his or her own, has no adequate remedy at law.

> Special circumstances allowing setoff under independent equity jurisdiction include insolvency, fraud and the nonresidence of the plaintiff in an action.

---

[13](...continued)
state court seeking to hold RBOP Tools in default under the terms of the termination agreement. Such action seems to be an underhanded attempt to interfere with this court's consideration of issues long before this court.

20 Am Jur 2d <u>Counterclaim, Recoupment, and Setoff</u> § 11(1995)(footnotes omitted).

Alabama courts have recognized the right of equitable set-off in appropriate circumstances. In <u>Head v. Southern Development Co.</u>, 614 So. 2d 1044 (Ala. 1993), the court summarized the law in Alabama as follows:

> The right of set-off (i.e., the right of a defendant to assert a counterdemand against the plaintiff, arising out of a transaction extrinsic to the plaintiff's cause of action) is a fundamental right of any creditor. It is based on principles of right, justice, and benevolence. The right of set-off, which is essentially a doctrine of equity, is based on the principle that natural justice and equity require that the demands of parties mutually indebted be set-off against each other and that, in a judicial proceeding by one against the other, only the balance should be recovered.

614 So. 2d at 1046-47. The facts in <u>Head</u> defy summation, but the import of its holding concerning the right of set-off is illustrated factually by the case of <u>Hinton v. Pollock Motor Car Co.</u>, 659 So. 2d 649 (Ala. Civ. App. 1995).

In <u>Hinton,</u> the defendant, Pollock, repaired the plaintiff's truck. The plaintiff, Hinton, was unable to pay the repair bill of $2,243.80 and Pollock refused to release the truck. Subsequently, while still in Pollock's possession, the truck was stolen. Hinton then sued Pollock alleging it was negligent in storing and protecting the truck. Pollock asserted in its answer that it was entitled to a set-off of $2,243.80 for the repair work it had performed. The trial court, after an <u>ore</u>

14

tenus proceeding, entered a judgment that awarded Hinton damages in the amount
of $8,000, less the $2,243.80 repair bill.[14]  659 So. 2d at 650.  The Court of Civil
Appeals quoted from Head and upheld the set-off of the repair bill as follows: "In
this case, Hinton and Pollock are mutually indebted; Hinton owes Pollock for the
repairs and Pollock owes Hinton for the loss of her truck.  Consequently, it was
proper for the trial court to set off the $2,243.80 repair bill."  659 So. 2d at 650.  It
is important to note that Pollock had apparently not reduced the debt on the repair
bill to judgment prior to being sued by Hinton.

      In the present actions, RBOP Tools is entitled to indemnification
from Folsom for the sums representing the Additional Amounts it might pay
Torus. RBOP Tools argues that it should be allowed to set off these sums against
the payments due Folsom on the promissory note.  It is clear that under Alabama
law RBOP Tools is entitled to set off the sums it is owed by Folsom against the
sums it owes Folsom under the terms of the promissory note.  If both debts were
liquidated the situation would be the same as that facing the court in Hinton.  In
the present cases, however, Folsom's ultimate liability has not been determined.

---

[14]  The judgment also allowed the defendant to set off a previous judgment
recovered by the plaintiff from another repair shop for negligent repair of the
truck.  This portion of the trial court's judgment was reversed, but is not relevant
to the issues presented in the instant action.

The problem facing RBOP Tools is that it is currently obligated to make payments to Folsom on a note, whereas the ultimate amount of any indemnification due from Folsom is indeterminate.  Ultimately RBOP Tools will be entitled to indemnification from Folsom, but this right might prove illusory should Folsom at that time be unable to pay.  It would clearly be unjust to require RBOP Tools to continue to pay sums to Folsom, when Folsom might ultimately be unable to indemnify RBOP Tools.  In such circumstances, equity must step in to prevent an obviously unjust result.

<h2 style="text-align:center;">PAYMENT INTO THE REGISTRY OF THE COURT</h2>

In <u>Dudley v. Whatley</u>, 14 So. 2d 141 (Ala. 1943), the plaintiff filed a bill in equity to enjoin the defendant from collecting certain judgments and to effect an equitable set-off.  The judgments resulted from the defendant's claims in an action at law for rents of a dwelling house.  The plaintiff was prevented in those actions from raising an indebtedness of the defendant to him, and, therefore, he filed his bill in equity to enjoin the collection of the judgments.[15]  The Alabama Supreme Court observed the following in relation to the right of equitable set-off:

---

[15]  Modern rules of procedure would remove the necessity of an independent action to enforce an equitable set-off.  Nonetheless, the policies discussed are relevant to the request of RBOP Tools to be relieved of its obligation to pay the sums due Folsom because of a right to set off the amounts that Folsom might ultimately owe RBOP Tools under the indemnity provision of the termination agreement.

> "While the mere existence of mutual and independent demands does not authorize the interposition of a court of equity to set them off against each other, yet, 'where there is some intervening equity which renders it necessary for the protection of the demand sought to be set off, that court will interpose to see that justice is done.' . . . The insolvency of the party against whom the set-off is claimed is, as a general rule, such a special equity as will justify a court of equity in taking jurisdiction to allow the set-off . . . ."

14 So. 2d at 144 (quoting Fischer v. Pope, 171 So. 752, 753 (Ala. 1937)). The

court continued:

> The text of R. C. L., supra is: "In order to effect an equitable set-off it is well settled that equity has jurisdiction to restrain a judgment creditor from collecting his judgment against the judgment debtor, until a claim of the latter against the former has been judicially established, and then to permit an equitable offset of the one against the other, <u>where the judgment creditor is either insolvent, or has no property out of which the judgment debtor can collect his claim, or has secreted his property in order to defeat the claim of the judgment debtor</u>, the judgment debtor in asserting his claim being free from negligence; and relief will be given where the claim of the judgment debtor, as a matter of practice, could not have been interposed as a counterclaim or defense in the action in which the judgment was rendered . . . ."

14 So. 2d at 144 (emphasis added).

Although <u>Dudley</u> might not be directly on point, the equitable

principles enunciated therein are. In the present action, evidence[16] suggests that

---

[16] For example, the November 9, 1994, deposition of Aubrey Folsom, Jr., Folsom's sole shareholder, suggests that Folsom is not engaged in any revenue producing activity and that the only asset out of which any judgment for indemnity

(continued...)

17

Folsom "is either insolvent, or has no property out of which the [RBOP Tools] can collect [its] claim, or has secreted [its] property in order to defeat the claim of [RBOP Tools]." See Dudley 14 So. 2d at 144. To require RBOP Tools to continue to pay Folsom the amounts due under the promissory note while the amount of any indemnity owed by Folsom to RBOP Tools is determined would be unjust. RBOP Tools might ultimately find itself without any meaningful remedy on its claim for indemnification should Folsom, the wrongdoer, be unable to satisfy any judgment rendered. To prevent such injustice in Dudley, collection of the judgments were enjoined until such time as the amount of the set-off could be determined. In the instant actions, payment of the sums due under the terms of the promissory note into the registry of the court will accomplish these equitable ends. When the amount of any set-off to which RBOP Tools is entitled is determined, the funds paid into the registry of the court may be distributed as appropriate.[17]

---

[16](...continued)
could be satisfied is the promissory note from RBOP Tools.

[17] RBOP Tools also seeks to set off any past or future amounts paid to Folsom against any sums it might ultimately be required to pay Torus in order to enjoy the benefits of the Torus to Folsom sales agreement. Such a set-off is not appropriate. The situation is analogous to a sublease. If the lessee fails to pay the lessor the rentals, the sublessee may not retain possession even if he has paid the
(continued...)

## CONSTRUCTIVE TRUST

In addition to the requirement that Folsom pay future sums due under the promissory note into the registry of court, the court will impose a constructive trust on the proceeds of the sale of the RBOP technology in favor of Torus to the extent of the unpaid Additional Amount due under the Torus to Folsom sales agreement. The imposition of constructive trusts to avoid injustice has long been recognized in Alabama. In <u>Sanford v. Hamner</u>, 22 So. 117 (Ala. 1897), the court quoted from Pomeroy concerning the nature of constructive trusts:

> "Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner . . . . I think, that all instances of constructive trusts, properly so called, may be referred to what equity denominates 'fraud,' either actual or constructive, as an essential element and as their final source. . . . Certain species of the constructive trusts arise from actual fraud. Many others spring from the violation of some positive fiduciary obligation. In all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that <u>unconscientious conduct which equity calls constructive fraud</u>. Courts of equity, by thus extending the fundamental principles of trusts . . . to all cases of actual or constructive fraud <u>and breaches of good faith</u>, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property. They can follow the real owner's specific property, and preserve his real ownership, although he has lost, or even never had, the legal title, and can thus give <u>remedies far more complete than the</u>

---

[17](...continued)

rental amount to the primary lessee. Similarly, RBOP Tools may not set off the amounts it has paid Folsom against any sums it might be required to pay Torus.

> compensatory damages obtainable in courts of law. The principle is
> one of universal application. It extends alike to real and personal
> property, to things in action, and funds of money."

22 So. at 119-20 (quoting 2 Pom. Eq. Jur. § 1044)(emphasis added). The court

continued its quote from Pomeroy: "Equity jurisprudence contains few more

efficient doctrines than this in maintaining the beneficial rights of property." 22

So. at 119-20 (quoting 2 Pom. Eq. Jur. § 1044).

   The Alabama Supreme Court has recently reiterated that the doctrine

has wide application even when the holder of the property over which the trust is

sought is not guilty of fraud or wrongdoing. In Brown v. Brown, 604 So. 2d 365,

(Ala. 1992), the court rejected the appellant's argument  that a constructive trust

could not be imposed "because she was not guilty of fraud, wrongdoing, abuse of

a confidential relationship, or any other form of unconscionable conduct." 604 So.

2d at 370 ("This argument is without merit.") To support this conclusion, the

court quoted from American Family Care, Inc. v. Irwin, 571 So. 2d 1053, 1058

(Ala. 1990).

   In American Family Care, the court noted that in addition to cases in

which the title to the property is held "by fraud, commission of wrong, abuse of a

confidential relationship, or any other form of unconscionable conduct," a

constructive trust may be imposed "against a person, who, against the rules of

20

equity and against good conscience, in any way either has obtained <u>or holds and</u>
<u>enjoys legal title to property that in justice that person ought not to hold and enjoy</u>.
571 So. 2d at 1058 (emphasis added). Therefore, it is not necessary that the holder
of the property acquire the property through improper means, it is enough if the
retention of the property would be unconscionable. Therefore, it is not necessary
to find actual wrongdoing on the part of Folsom in acquiring the RBOP
technology from Torus—merely that its retention of the proceeds of the Folsom to
RBOP Tools sale, to the extent of any Additional Amounts owed to Torus, would
be unconscionable.[18]

        Constructive trusts operate to prevent unjust enrichment. <u>See</u> <u>e.g.</u>,
<u>Coupounas v. Morad</u>, 380 So. 2d 800 at 803 (Ala. 1980)("A constructive trust is a
creature of equity that operates to prevent unjust enrichment . . . ."). Folsom
would be unjustly enriched if it were allowed to retain the proceeds of the sale to
RBOP Tools while Torus remains unpaid for the Additional Amount due. In the
hands of Folsom, use of the RBOP know-how through sales or rentals of RBOP
units, clearly required Folsom to pay Torus the required Additional Amount. By

---

        [18] Although Torus only has a contract right to receive the Additional
Amounts, it originally owned the entire interest in the RBOP technology. It is this
property interest, which it sold to Folsom, that forms the basis for the imposition
of a constructive trust.

21

selling its proprietary interest in the RBOP technology to RBOP Tools for a sum certain, and by not requiring RBOP Tools to assume the obligation to pay the Additional Amount, Folsom has attempted to appropriate the Additional Amount for itself. Without question RBOP Tools would have paid a lesser sum to Folsom if it were going to be required to pay Torus the Additional Amount. The actual sales price agreed upon between Folsom and RBOP Tools, therefore, takes into account that RBOP Tools would not be liable for the Additional Amount. It contains within it an amount representing the projected present value of the Additional Amounts due in the future. The retention of this portion of the sales price by Folsom would unjustly enrich Folsom at the expense of Torus.

Folsom's actions clearly amount to a "breach of good faith" sufficient to warrant the imposition of a constructive trust. This is not to say that any breach of the duty of good faith implied in all contracts will justify the imposition of a constructive trust. Under Alabama law, a constructive trust will not be imposed unless the relief at law would be inadequate.[19] In American Family Care, supra., the court adopted the following rule:

---

[19]   To prevent injustice, however, a constructive trust may be imposed upon the property transferred in a sales transaction. See Banton v. Hackney, 557 So. 2d 807 (Ala. 1989)(trial court imposed a constructive trust on money paid to purchase stock because of misrepresentation as to the financial condition of the corporation).

22

> However, as to constructive trusts, while equity has the power to act,
> it will not; unless a fiduciary or quasi-fiduciary relation is involved,
> or unless relief at law would be inadequate because the chattel is
> unique or the defendant-wrongdoer is insolvent.

571 So.2d at 1061(quoting "Must the Remedy at Law be Inadequate Before a

Constructive Trust will be Impressed?" 25 St. John's L. Rev. 283, 295

(1951).)(emphasis added). Torus's remedy at law is clearly inadequate. It may not

recover the RBOP technology from RBOP Tools and it may not enjoin RBOP

Tools from utilizing that technology.[20] The entity primarily responsible for paying

the Additional Amount is no longer the entity generating the sale or rental giving

rise to that obligation. This severance has allowed Folsom to be in a position to

remove assets from the corporate entity, thereby leaving Torus without meaningful

recourse. As long as Folsom was generating the sale or rental, it would have had

to retain physical assets, from which any money judgment might ultimately be

satisfied. Folsom is now free to withdraw the sums received from RBOP Tools on

the promissory note. These facts, along with the possibility that Folsom is

---

[20] RBOP Tools might deem its position in the market so secure that it would
refuse to pay the Additional Amount even if Folsom fails to do so, even though
that would mean Torus might resell the RBOP technology or even compete against
RBOP Tools. Such market dominance might also leave Torus with unmarketable
trade secrets. Often the value of a trade secret derives from the exclusive right to
use it and the ability to be the first to do so. It is thus possible that Torus would
not be able to sell the RBOP technology to another buyer or profitably exploit it
by competing with RBOP Tools.

insolvent, make Torus's remedy at law inadequate and justify the imposition of a constructive trust on the proceeds of the Folsom to RBOP Tools sale of the RBOP technology.

Another important feature of constructive trusts relevant to the present case is that the person in whose favor the constructive trust is imposed might never have had legal title to the subject property. See Sanford, supra.   In the present case, Torus never had legal title to the proceeds of the Folsom to RBOP sale. Nonetheless, in order to prevent unjust enrichment, a constructive trust must be imposed on these proceeds to the extent of the Additional Amount. Torus relinquished its property rights in the RBOP technology partly in return for a right to receive the Additional Amount for ten years. Folsom has through artful legal maneuvers attempted to appropriate for its own benefit these Additional Amounts. Even though Torus had relinquished its proprietary rights in the RBOP technology and never had a legal interest in the promissory note, equity may nonetheless impose a constructive trust on the proceeds of the Folsom to RBOP sale.[21]

_____

[21]  The record does not presently support the imposition of a constructive trust on the RBOP technology in RBOP Tools hands.  However, should it be shown that RBOP Tools conspired with Folsom in an attempt to cut off Torus's right to the Additional Amount, such a remedy might be appropriate.

Any constructive trust imposed must take into consideration the

particular facts presented.

> It is also clearly inherent in the very nature of equity proceedings that
> the trial court is authorized to mold its decree so as to adjust the
> equities of all parties and to meet the obvious necessities of each
> situation.

Coupounas, 380 So. 2d at 803.  One feature of constructive trusts particularly

important to the present case is the court's power to reach property no longer in

the hands of the wrongdoer.  In Bevels v. Hall, the court observed as follows:

> [A] court of equity has jurisdiction to reach the property in the hands
> of the original wrongdoer, or in the hands of a subsequent holder,
> until a purchaser of it in good faith and without notice acquires a
> higher right, and takes the property relieved of the trust.

21 So. 2d 325 (Ala. 1945)(quoting American Traders' National Bank v.

Henderson, 133 So. 36, 38 (Ala. 1931)).  Therefore, in appropriate circumstances,

Torus may be able to trace the proceeds even though they have been removed from

Folsom.[22]

The chancellor's conscience is offended by Folsom's actions, and

"[a] constructive trust is the formula through which the conscience of equity finds

---

[22] For a good example of the mechanics of how a constructive trust follows
property that has been converted from its original form, See Banton v. Hackney,
557 So. 2d 807, 817-21 (Ala. 1989)(trial court opinion quoted by the supreme
court to provide factual background).

expression." Longley v. Patton, 86 So. 2d 820, 822 (Ala. 1956)(quoting Bogert,

The Law of Trusts and Trustees, Vol. 3, §§ 471, 472).  To prevent unjust

enrichment and to remedy Folsom's breach of good faith and unconscientious

conduct, a constructive trust will be imposed upon the proceeds of the Folsom to

RBOP Tools sale.  Folsom, therefore, holds all proceeds from the sale, including

the promissory note and all prior and future payments thereon in trust for the

benefit of Torus to the extent of the Additional Amounts due Torus.  Future

payments on the promissory note shall be paid into the registry of the court until

such time as the amount of the Additional Amount due Torus is ultimately

determined.  In addition, a constructive trust will be imposed upon the proceeds

already paid to Folsom.  This constructive trust will be imposed both upon such

proceeds in the hands of Folsom and upon any monies or property traceable

therefrom in the hands of any subsequent holder, unless such holder is a purchaser

in good faith and without notice.[23]  See Bevels v. Hall, 21 So. 2d  at 327.

---

[23] If Folsom is adjudicated insolvent, any transfers for inadequate
consideration from Folsom while insolvent, as well as any transfer(s) that cause
Folsom to become insolvent, will be constructively fraudulent.  See Brett v.
Zodiac Industries, Inc., 409 So. 2d 451, 452 (Ala. Civ. App. 1982)(explaining
shifting burdens of proof regarding voluntary conveyances).

## RBOP TOOLS' CLAIM FOR ATTORNEY'S FEES

RBOP Tools seeks to recover attorney's fees from Folsom based upon an exception to the general rule that attorney's fees may not be recovered. The exception relied on by RBOP Tools was set forth in <u>Highlands Underwriters Insurance Co. v. Elegante Inns, Inc.</u> as follows:

> [I]t is generally recognized that where the natural and proximate consequences of the defendant's wrongful act causes the plaintiff to become involved in litigation with a third person, attorneys' fees and other expenses incurred in such litigation may be recovered as damages.

361 So.2d 1060, 1066 (Ala. 1978)(citations omitted). RBOP Tools claims that the wrongful actions of Folsom necessitated its intervention in Folsom I and, therefore, the attorneys' fees and other expenses incurred in prosecuting its claims against Torus in that action are recoverable under the above exception to the general rule.

In <u>Highlands</u>, the court relied on the earlier Alabama Supreme Court decision in <u>Fidelity & Casualty Co. of New York v. J.D. Pittman Tractor Co.</u>, 13 So.2d 669, 244 Ala. 354 (1943). In that case the insurance company falsely represented to the insured, Pittman, that it had liability coverage for certain business operations when it in fact did not. A worker was killed while performing a non-covered operation. The insurance company denied coverage and refused to

defend a suit resulting from the accident.  In discussing the damages to which
Pittman would be entitled as a result of the insurance company's
misrepresentation, the court stated that Pittman would be "entitled to recover the
amount paid in satisfaction of the Chance judgment, the court costs in connection
therewith, and attorney's fees paid for defending that suit . . . ." 13 So.2d at 672.
Though it is not specifically mentioned in the opinion, a duty on the part of the
insured to defend the underlying suit based upon a contract of insurance was
presumably involved.  That is, the misrepresentation by the insurance company
must have caused Pittman not to have a policy requiring the insurance company to
defend the underlying suit.  Therefore, Pittman's expense in defending that suit
was caused by that misrepresentation.

In <u>Highlands</u>, a somewhat different fact situation was involved.  In
short, the insured brought suit against the insurance company to reform the
insurance policy based upon a mistaken endorsement of the policy.  In a separate
action the insured sued the insurance agent for negligently endorsing the policy
over to a third party and for causing it to be under-insured.  The cases were
consolidated for trial.  The trial court reformed the policy and found the agent
guilty of negligence and awarded damages.  The Alabama Supreme Court was
faced with the question of whether the insured could recover as part of its damages

28

against the agent the attorneys' fees incurred in its successful effort to have the

insurance policy reformed.  After noting the above quoted exception to the general

rule, the court set forth the required elements for a recovery of attorneys' fees in a

tort suit as follows:

(1)     The plaintiff must have incurred attorneys' fees in the
        prosecution or defense of a prior action.

(2)     The litigation must have been against a third party and not
        against the defendant in the present action.

(3)     The plaintiff must have become involved in such litigation
        because of some tortious act of the defendant.

361 So.2d at 1066 (citations omitted).

        Two of the listed elements require expansion.  Although the list

includes a requirement that the fees must have been incurred in a prior action,

Highlands has been interpreted to the contrary.  In Wood v. Old Security Life

Insurance Co., the Fifth Circuit Court of Appeals determined that the prior action

limitation was not in fact followed by the Highlands court and, therefore, refused

to interpret Highlands as imposing such a requirement.  643 F.2d 1209, 1218 (5th

Cir. May 1, 1981).  Additionally, it has been noted that the Highlands exception to

the general rule "also applies where litigation with a third party was the result of

the breach of a contractual duty between the parties."  First Ala. Bank v. First

29

State Ins. Co., Inc., 899 F.2d 1045, 1070 (11th Cir. 1990)(citing <u>George E. Jensen</u>

<u>Contractor, Inc. v. Quality Mill Works, Inc.</u>, 431 So. 2d 1232, 1234 (Ala. 1983)).

        In <u>George E. Jensen Contractor, Inc. v. Quality Mill Works, Inc.</u>, 431

So.2d 1232 (Ala.1983), the plaintiff sought to recover from its supplier attorneys'

fees it had incurred in a prior successful appeal to the Armed Services Board of

Contract Appeals. Because the court found that the supplier had breached no duty,

that court's discussion concerning the third-party exception is <u>obiter dictum</u>.

However, it provides a useful insight into the rationale behind the rule. The court,

in considering the plaintiff's assertion that its litigation with the government was

solely in defense of the supplier's goods stated as follows: "[I]t is clear that

Jensen [the plaintiff] had a separate, independent interest in the litigation." 431

So.2d at 1236. The court also quoted a case from another jurisdiction for the

proposition that if the plaintiff had defended against any allegations of his own

negligence, the exception would not apply. 431 So.2d at 1236. The court

concluded its discussion as follows: "For these reasons we cannot agree that

Jensen is a mere passive middleman caught up in a suit that rightfully should have

been between Quality [the supplier] and the Government." 431 So.2d at 1236.

        When considering whether RBOP Tools is entitled to recover

attorneys' fees from Folsom in the present case, the rationale behind <u>Highlands</u>

must be kept in mind. Attorneys' fees are allowed under the <u>Highlands</u> exception

to the general rule <u>as an element of damages</u>. In the present case, any recovery of

attorneys' fees by RBOP Tools would constitute an element of damages for breach

of contract. As this court noted in its earlier opinion, the general rule regarding

damages for the breach of a contract is that "[d]amages should return the injured

party to the position he would have been in had the contract been fully

performed." <u>Garret v. Sun Plaza Development Co.</u>, 580 So. 2d 1317, 1320 (Ala.

1991). "These damages are generally those that flow naturally from the breach."

580 So.2d 1320.

       As part of the contract of sale of the RBOP business, Folsom

represented and warranted to RBOP Tools, among other things, that "[Folsom] has

all requisite power . . . to dispose of the Assets on the terms described herein . . ."

(Termination Agreement at ¶ 9.1(b).); that "the execution and delivery of this

Agreement, the consummation of the transactions contemplated hereby and the

fulfilment of and compliance with the terms and provisions hereof do not and will

not . . . result in a breach of [or] constitute a default under . . . any agreement . . . to

which [Folsom] is a party or by which it is bound or to which any property of it is

subject or result in the creation of any lien, charge or encumbrance upon the

Assets under any such agreement or instrument . . ." (Termination Agreement at

31

¶ 9.1(c).); that "there are no royalties, licence fees, liens or charges or any other encumbrances of any kind whatsoever in favor of any third party claiming by, through or under [Folsom] in respect of the Assets . . ."  (Termination Agreement at ¶ 9.1(f).)(emphasis added); and that "[Folsom] has good right, full power and absolute authority to bargain, sell, transfer, assign and convey the Assets for the purposes, and in the manner, herein provided according to the true intent and meaning of this Agreement . . ." (Termination Agreement at ¶ 9.1(i).)  As the court noted in its earlier opinion, without question Folsom breached these warranties, and as to these breaches there exists no genuine issue of fact.  The question facing the court is whether the natural and proximate consequences of Folsom's breach of these warranties caused RBOP Tools to become involved in litigation with Torus. If so, RBOP Tools' attorneys' fees may be recovered as damages.  See Highlands, 361 So. 2d at 1066.

It is clear that RBOP Tools became involved in litigation with Torus as a direct result of Folsom's breach of one or more of the above warranties.  Once Torus filed its counterclaim in the instant suit, RBOP Tools had no choice but to intervene to protect its interests.  As an alternative to recovery of the Additional Amount, Torus as a counterclaim in its original answer sought a declaration that Folsom had breached the sales agreement, thus relieving Torus of its obligations

32

under the agreement, including its obligation not to compete. This was prior to the

time RBOP Tools filed its motion to intervene. If Torus were to be awarded such

relief, RBOP Tools might have lost much of the value of the know-how purchased

from Folsom. Folsom's contention that "RBOP Tools was not brought into this

litigation as a result of any wrongful act of Folsom" but "[r]ather, RBOP Tools

insinuated itself into this litigation . . ." is simply unsupportable. But for the

breach of these warranties by Folsom, RBOP Tools would not have been required

to intervene in the present action to protect its interest. For this reason, First Ala.

Bank v. First State Ins. Co.,Inc., is distinguishable, and Folsom's reliance on that

case to support its position is misplaced.[24]

In First Ala. Bank, the plaintiff sued its insurer, First State, to recover

on an errors and omissions insurance policy and to recover damages for fraud.

The plaintiff also sued its insurance broker, Johnson & Higgins, for failure to

provide expertise and skill as plaintiff's exclusive insurance broker. The plaintiff

sought to recover attorneys' fees from Johnson & Higgins for its expenses

incurred in suing First State, contending that Johnson & Higgins' breach of

---

[24] The undersigned is intimately aware of the facts in the First Ala. Bank
case, having been the district judge who presided over that nonjury action. The
court's opinion on the issue of attorney's fees, First Ala. Bank v. First State Ins.
Co.,Inc., 1987 WL 68487 (N.D. Ala.), is particularly relevant.

contract necessitated the suit against First State. This court, as well as the court of appeals, concluded that the Highlands exception did not apply because the plaintiff asserted independent claims against First State. As the court of appeals phrased it, "there is no indication that First Alabama would not have sued First State but for Johnson & Higgins' breach of contract." 899 F.2d at 1071. By contrast, in the instant case, had the representations and warranties made by Folsom to RBOP Tools been true, RBOP Tools would not have needed to intervene in the instant action.[25] In First Alabama, First State committed fraud independent of the wrongdoing of Johnson & Higgins. In the present case, Folsom has not introduced a genuine issue of fact as to wrongdoing on the part of either Torus or RBOP Tools . Quite simply, the only wrongdoer is Folsom and without its wrongful actions, both as to Torus and RBOP Tools, there would be no lawsuit.

For these reasons, RBOP Tools is entitled to recover attorneys' fees incurred in Folsom I as an element of damages. RBOP Tools is only entitled to recover the attorneys' fees attributable to prosecuting the action as against Torus.

---

[25] There has been no allegation made by Folsom that RBOP Tools was aware of facts that would lead it to believe its exclusive rights in the RBOP technology would be dependent upon Folsom's continued payment of the Additional Amount. It is highly unlikely RBOP Tools would have agreed to buy the RBOP technology had it been aware of such facts.

There exists no genuine issue of fact as to Folsom's liability for these attorneys'
fees and RBOP Tools is entitled to a judgment on the issue of liability as a matter
of law.

### III.
### FOLSOM II

Folsom's motion for summary judgment in Folsom II is due to be
denied. This court's rulings in Folsom I prior to the time Folsom II was filed
establish that Folsom breached the Termination Agreement. It is this agreement
that underlies the promissory note and provided the consideration for its issuance.
Partial failure of consideration operates to reduce recovery on a note. Parker v.
McGaha, 280 So. 2d 769, 772 (Ala. 1973); Potter v. Owens, 535 So.2d 173, 175
(Ala. Civ. App. 1988); Ala. Code §7-3-303(b) (1975). Folsom's failure to fulfill
the promises and warranties contained in the Termination agreement constitute a
partial failure of consideration. Folsom's recovery on the note will be reduced
because of such partial failure of consideration. Genuine issues of facts exist as to
the amount of any reduction. Therefore, Folsom's motion for summary judgment
in Folsom II is due to be denied.

RBOP Tools has filed a cross motion for summary judgment in
Folsom II asserting that it is entitled to a judgment as a matter of law on each

count of Folsom's complaint. This part of RBOP Tools' motion is due to be
denied, there existing a genuine issue of fact as to the amount of any reduction to
which RBOP Tools is entitled. As an alternative RBOP Tools seeks a partial
summary judgment finding that it is entitled to set off, against the sums due on the
promissory note, any sums Folsom might owe by virtue of its obligation to
indemnify RBOP Tools. Because in Folsom I the court will require RBOP Tools
to pay the sums due under the promissory note into the registry of court, RBOP
Tools right to a set-off will be protected. The issue of a set-off was before the
court in Folsom I at the time Folsom II was filed and it should be decided in that
action. Therefore, the court's ruling in Folsom I on the issue of setoff is
controlling on that point and RBOP Tools' alternative motion for summary
judgment is due to be granted to the extent of the relief awarded in Folsom I, and
denied in other respects.

## IV.
## CONCLUSION

In order to make meaningful RBOP Tools' right to a set-off in both
Folsom I and II, the court will order the remaining payments under the terms of the
promissory note paid into the registry of court as they fall due. As a supplemental
and alternate remedy, the court will impose a constructive trust on the proceeds of

36

the Folsom to RBOP Tools sale of the RBOP technology.  This constructive trust

extends to any proceeds still in the hands of Folsom, as well as to any property

traceable to those proceeds, whether in the hands of Folsom; its shareholders; or

any other person not having acquired such property for value, in good faith and

without notice.  By virtue of this constructive trust, RBOP Tools will be required

to pay into the registry of court the remaining payments due under the terms of the

promissory note, where they will be held in trust for the benefit of Torus to the

extent of any unpaid Additional Amounts.  These payments shall be deemed to

have been made to Folsom, since it is Folsom which holds these sums in trust for

Torus.  Any proceeds already in the hands of Folsom are held by Folsom in trust

for Torus to the extent of any unpaid Additional Amounts.  To the extent Folsom

retains any proceeds already received, it will be enjoined from transferring or

otherwise disposing of those sums.

Torus will be granted leave to conduct discovery into the finances of

Folsom to determine whether Folsom is solvent, whether it retains any proceeds

from the Folsom to RBOP Tools sale and to trace those proceeds into the hands of

others.  To the extent Torus can trace those proceeds, the court will entertain

appropriate motions.

37

RBOP Tools is entitled to recover attorneys' fees expended in the prosecution of Folsom I as against Torus. The amount of any such award must be determined at a later date.

Folsom's motion for summary judgment in Folsom II will be denied. RBOP Tools' motion for summary judgment will be granted to the extent of the relief afforded on its pending motions in Folsom I, in other respects it will be denied.

Through artful lawyering, Folsom, the only clear wrongdoer, has attempted to both have its cake and eat it. It purchased a valuable asset from Torus, promised to pay an Additional Amount upon each sale or rental of an RBOP unit, and then sold the technology to RBOP Tools. It attempted to structure the sale to RBOP Tools in such a fashion so as to deprive Torus of the Additional Amount, thereby appropriating that sum for itself. While motions were pending before this court relating to RBOP Tools' continuing obligation to make payments due under the terms of the promissory note, Folsom filed suit in state court seeking to collect on that same promissory note in a clear attempt to prevent this court from deciding issues long pending in Folsom I. Folsom has breached its promises to Torus, made false representations and warranties to RBOP Tools and attempted

38

to subvert this court's ability to rule on pending motions. The above outlined

rulings represent the court's best effort to see that justice is done.

Appropriate orders will be entered contemporaneously herewith.

DONE this 2nd day of Sept 1999.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

39