FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA   01 JAN 18 AM 9: 48
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

FOLSOM METAL PRODUCTS, INC., an )
Alabama corporation, )
 )
 )
Plaintiff, )
 )
v. )   CIVIL ACTION NO. 94-G-0988-S
 )
TORUS EQUIPMENT COMPANY, )
 )
Defendant. )
 )
 )
 )
RBOP TOOLS INTERNATIONAL, INC., )   **ENTERED**
a Texas corporation, )
 )   JAN 1 8 2001
Intervenor-plaintiff. )

**********************************   CONSOLIDATED WITH:

FOLSOM METAL PRODUCTS, INC., )
 )
Plaintiff, )
 )
v. )
 )   CIVIL ACTION NO. 99-G-0003-S
RBOP TOOLS INTERNATIONAL, INC., )
 )
Defendant. )

## MEMORANDUM OPINION

This cause is before the court upon the motion of Folsom[1] for

reconsideration [Doc. # 106].  In its motion Folsom requests this court to reconsider three

---

[1] This court will, as in it's prior opinions, refer to the parties as "Folsom" "Torus" and "RBOP Tools."

of its previous rulings: (1) that none of the proffered parol evidence could be utilized in
construing the written agreements[2] between Folsom and Torus; (2) the imposition of a
constructive trust; and (3) the court's order requiring certain funds to be placed in the
registry of the court.

## I.

### THE REFUSAL TO ADMIT PAROL EVIDENCE

#### A.    The Court's Rulings

This court made the following rulings with respect to construing the
contract of sale between Torus and Folsom:  First, that the "written sales agreement and
written settlement agreement represent[ed] a complete integration of the agreement
between Torus and Folsom with respect to the subject matters contained therein;"
(Memorandum Opinion, September 2, 1998 at 10 (hereinafter "1998 Opinion"),) second,
that "the proffered parol evidence submitted by the parties did not establish the existence
of a latent ambiguity in the written contracts;" (1998 Opinion at 14,) and third, that any
interpretation of the sales contract between Torus and Folsom must come from the writing
itself. (1998 Opinion at 17.)  These rulings were extensively explained and supported in

---

[2] The written contract between Torus and Folsom consists of the original sales
contract and a "Settlement Agreement and Mutual Release" executed in connection with
the settlement of a lawsuit.  The settlement agreement made certain modifications to the
sales agreement, but in other respects left the sales agreement in force.  References to the
"written contract," "written contract documents" or similar language will mean these two
documents collectively.

this court's 1998 opinion.  However, because Folsom's motion is replete with

misstatement of this court's holdings and the applicable law, the court feels compelled to

reiterate its holding on the issue of parol evidence and to point out the error in Folsom's

legal reasoning.

> **B.**   **This court did not hold that the written agreement contained
> ambiguities requiring the introduction of parol evidence as to the
> interpretation of the provision of the written contract providing for the
> payment of an additional amount.**

Folsom argues in its motion that this court held the agreement uncertain on

the issue of Folsom's continuing liability for the payment of the additional sum:

> Yet this Court noted in its 1998 Opinion that the Agreement was uncertain
> on the issue of royalties.  Specifically, it held that "Folsom's continuing
> liability for royalties in spite of its sale to RBOP Tool [sic]" was one of
> "two <u>areas of uncertainty</u> presented by the Agreement."  1998 Opinion, p.
> 15 (emphasis added).

(<u>Folsom's Motion for Reconsideration</u> at p. 8-9.)  There is nothing on page 15 of the 1998

opinion remotely resembling the above "holding" and the phrase "two areas of

uncertainty presented by the Agreement" is not found in that opinion.  Counsel for

Folsom apparently fabricated the above "holding" from the following language found at

page 22 of the 1998 opinion:

> <u>In the dispute between Torus and Folsom</u>, two areas of uncertainty are
> presented.  The first concerns Folsom's continuing liability for royalties in
> spite of its sale to RBOP Tools of all of the RBOP units it owned and the
> rights to sell or rent any newly manufactured RBOP units.  Folsom argues
> that the new Paragraph 3.1(b)(i) means that it is only obligated to pay
> royalties on sums it actually receives for the sale or rental of RBOP units.
> Since it will no longer receive revenues from the sale or rental of RBOP

> units, it argues it owes no continuing obligation to Torus. The second
> uncertainty involves the apparently contradictory provisions of the sales
> agreement—Paragraph 13.3, which apparently authorizes Folsom to transfer
> its rights relating to the RBOP in connection with the sale of its business,
> and Paragraph 10.1(b), which provides that ceasing to do business
> constitutes a material default.

(Emphasis added.) This language is found in the section of this court's opinion <u>following</u> the court's determination that the proffered parol evidence was inadmissible and after the court had noted that even if there were no latent ambiguities, the interpretation of the written contract might be uncertain. ("It is further the province of the court, not the jury, to construe a policy, even though ambiguous and unclear but not void for uncertainty, where the interpretation must come from the writing itself." (<u>1998 Opinion</u> at 18 (quoting <u>American and Foreign Ins. v. Tee Jays</u>, 699 So.2d 1226, 1228 (Ala. 1997).) The court was simply setting out the parties' relative positions. To characterize this as a holding that the agreement is uncertain on the issue of Folsom's continuing liability for the payment of the additional sum, thereby warranting the introduction of parol evidence, is misleading at best. To enclose the fabricated "holding" in quotation marks is inexcusable.

      **C.**      <u>**The court of appeals did not hold that the written agreement contained**</u>
<u>**ambiguities requiring the introduction of parol evidence as to the**</u>
<u>**interpretation of the provision of the written contract providing for the**</u>
<u>**payment of an additional amount.**</u>

      Folsom argues that the court of appeals held the agreement ambiguous on the issue of Folsom's continuing liability for the payment of the additional sum:

The appellate court went on to hold, specifically, that the Agreement <u>is</u> <u>ambiguous on the central issue of royalties</u>. <u>Id</u>. ("it is not unambiguously clear whether Torus had a valid expectation of a ten year royalty on lease proceeds . . . .").

(<u>Folsom's Motion for Reconsideration</u> at p. 4.)   In context, the excerpted quotation (in italics) is as follows:

> Apart from the possibility of default and its consequences <u>as provided by</u> <u>the agreement itself</u>, the issues may be viewed through the lens of impossibility of performance. *It is not unambiguously clear whether Torus had a valid expectation of a ten year royalty on lease proceeds* and whether Folsom had made that expectation unattainable by making a plenary sale of all leasable units and walking away from the RBOP business.  Without using the term "impossibility" Folsom is in effect invoking impossibility as a defense to Torus's counterclaim (as well as using it affirmatively as a basis for summary judgment in its favor).  But impossibility cannot be invoked by a party who has made performance infeasible through its own actions. <u>Restatement (Second) of Contracts</u> § 261 (1979)  Arguably Torus's expectation or possibility of receiving royalties for ten years on leases is a basic assumption of the contract that has been made unattainable by Folsom's actions in selling out and abandoning "the Business."

113 F. 2d at 215 (emphasis supplied by underlining added).  In context it is clear that the quoted language does not relate to contract interpretation or to an ambiguity in the written agreement, but rather to the impossibility defense that the court of appeals perceived Folsom to have invoked.  It is clear that the court of appeals recognized that the impossibility  defense is distinct from the issue of default "as provided by the agreement itself."  If a party relies upon terms expressed in the agreement, as Folsom does in this case, it is not raising an impossibility defense.

Since Folsom has abandoned its impossibility defense, if it ever maintained one (See 1998 Opinion at 5), the quoted sentence from the court of appeals is not relevant to the issues faced by this court on remand.[3]  Section 261 of the Restatement (Second) of Contracts cited by the court of appeals provides as follows:  "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." (Emphasis added.)  It is clearly this language the court of appeals had in mind when it referred to whether or not Torus "had a valid expectation of a ten year royalty" and whether "Torus's expectation or possibility of receiving royalties for ten years on leases is a basic assumption of the contract."  This is

---

[3]  It is questionable whether an impossibility defense would be viable under Alabama law.  In Silverman v. Charmac, Inc., the court noted as follows:

> Impossibility, or under Restatement (Second) of Contracts, § 261, terminology, "impracticability," occurs when "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made. "If performance is impossible or impracticable a promisee's "duty to render performance is discharged, unless language or the circumstances indicate to the contrary." Id.  Nevertheless, this Court has not recognized the defense of impossibility or impracticability.  "Where one by his contract undertakes an obligation which is absolute, he is required to perform within the terms of the contract or answer in damages, despite an act of God, unexpected difficulty, or hardship, because these contingencies could have been provided against by the contract."

414 So. 2d 892, 894 (Ala. 1982).

clearly the language of impossibility and not of contract interpretation.  To remove the

sentence from its contextual setting and to use it as an argument that the written contract

documents are ambiguous is misleading.

It must be remembered that the court of appeals was reviewing Judge

Lynne's order granting summary judgment in favor of Folsom.  The court of appeals

stated Folsom's position as follows:

> Folsom's position is simple.  It agreed to pay 5% royalty on its sale
> or lease of RBOP units.  It sold all its units to Big D in one plenary sale for
> $2,100,000, and it offers to pay 5% thereof as royalty, as payments are
> received from Big D's successor.  It has no more units to sell or lease,
> therefore it has no obligation to Torus.  This position was accepted by the
> district court.

113 F.2d at 215.  It was in the context of the district court having accepted Folsom's

position that the court of appeals considered the question of contract interpretation and

the impossibility defense.  The holding of the court of appeals on the issue of contract

interpretation, as distinct from the defense of impossibility of performance, was in

essence very limited.  The following is the sum total of the court of appeals opinion on

that issue:

> It is certain that the agreement between Torus and Folsom is not clear and
> unambiguous.[4]  It is not clear whether Folsom agreed to continue in the

---

[4] This is clearly a direct reference to Judge Lynne's order granting Folsom's
motion for summary judgment.  In that order the only reason given for granting Folsom's
motion was the following:

(continued...)

7

business of selling and leasing RBOP's and whether it has defaulted by its transaction with Big D. [Folsom's characterization that it just purchased assets of Torus and not Torus's "Business" of selling and leasing RBOP's is untenable.] Article 10 describes a material default to include either party's ceasing to do business.   The series of agreements refer repeatedly to what Torus sold and Folsom bought as Torus's RBOP business, and what Folsom resold as its RBOP business.   In his deposition the sole stockholder of Folsom acknowledged that Folsom is not currently engaged in any business. Yet despite Article 10, paragraph 13.3 seems to authorize a sale by either party of its "respective business."

Folsom Metal Products, Inc. v. Torus Equipment Co., 113 F.3d 212, 215 (11th Cir.

1997)(internal footnote inserted and bracketed).  The only areas of uncertainty or

ambiguity suggested by the court of appeals involve the conflict between Articles 10.1(b)

and 13.3 of the sales agreement.  This court's holding did not rest upon those provisions,

but rather upon Article 3.1(b) of the sales agreement, as modified by the settlement

agreement.

       To hold for Folsom in its interpretation of Article 3.1(b) requires that the

ambiguity between Articles 10.1(b) and 13.3 be resolved.  That is, even if Folsom's

argument concerning the method of computing the additional sum is accepted, as Judge

Lynne did, the issue of whether Folsom was in default because it had ceased to do

_____

[4](...continued)
       After a review of the relevant contract provisions of record, which the court finds to be clear and unambiguous, it is ORDERED that plaintiff Folsom's and plaintiff intervenor RBOP Tools's motions for summary judgment are hereby granted.

(Order entered June 28, 1996, Doc. # 37.)

business would still be presented.  This would require that the apparent ambiguity

between Articles 10 and 13 be resolved.  The opinion of the court of appeals, therefore,

does not address directly the interpretation of Article 3.1(b).[5]

### D.    This court's holding is consistent with Cathbake.

Folsom's motion argues that this court erred because it did not follow

Cathbake Investment Co., Inc. v. Fisk Electric Co.,Inc., 700 F.2d 654 (11th Cir. 1983).

On that point counsel for Folsom are sharply critical of this court:

> On the issue of latent ambiguities, Cathbake is unambiguous.  The
> opinion simply leaves no room for interpretation:  It holds that the precise
> kind of evidence introduced by Folsom (and Torus, incidentally) must be
> considered when reviewing an agreement for latent ambiguities.  Given its
> clarity – and given the complete lack of case support for Your Honor's ban
> on negotiation and surrounding circumstance evidence[6] – this Honorable
> Court should grant Folsom's request for reconsideration.

(Folsom's Motion for Reconsideration at 10-11.)  Cathbake is not inconsistent with the

law applied by this court or with its actions in regard to Folsom's proffered parol

evidence.

In Cathbake, Fisk Electric Company, Inc. ("Fisk") and Cathbake Investment

Company, Inc. ("Cathbake") entered into a sales agreement whereby Fisk sold to

---

[5] It must be noted, however, that the way the court of appeals framed Folsom's
position, its statement that the district court accepted that position, and its ultimate
reversal of the district court's granting of summary judgment on behalf of Folsom, if
anything suggests that Folsom's interpretation of Article 3.1(b) was incorrect.

[6] This court did not "ban" negotiation testimony.  See discussion at page 13 below
and subpart E of this opinion.  Therefore, it cited no cases to support such a ban.

Cathbake all of the outstanding shares of Dyer Electric Company, Inc. ("Dyer"), one of

Fisk's wholly-owned subsidiaries. At issue was the meaning of Article 9.4 of the sales

agreement between Fisk and Cathbake which provided as follows:

> The parties to this Agreement recognize that there are certain inter-company
> accounts between Seller [Fisk] and the Corporation [Dyer]. At the closing,
> or as soon as practicable thereafter, Seller and the Corporation will clear
> these inter-company accounts, with each party paying to the other party all
> amounts due from inter-company transactions.

Cathbake 700 F.2d at 655 (alterations in original).  The parties disagreed over this

article's impact upon a net operating loss incurred by Dyer during the first part of 1978,

the year Dyer was sold to Cathbake.  The court of appeals explained the treatment of such

tax losses prior to the sale as follows:

> In connection with the filing of Fisk's consolidated income tax return, it was
> Fisk's practice to have the estimated tax credit or debit attributable to each
> of its subsidiaries, including Dyer, handled as follows:  If the subsidiary's
> operations resulted in taxable net income, then 50% of such amount (an
> approximation of the applicable corporate income tax rate) was entered on
> the subsidiary's books as an account payable and on Fisk's books as a
> receivable; if the subsidiary's operations resulted in a net loss, then 50% of
> such loss was entered on the subsidiary's books as a receivable and on Fisk's
> books as an account payable.

Cathbake 700 F.2d at 655.  Cathbake contended at trial that Article 9.4 obligated Fisk to

pay one half of the net operating loss incurred by Dyer from January 1, 1978, through

August 31, 1978.  This loss was reported on Fisk's 1978 consolidated income tax return.

Fisk argued that Article 9.4 was unclear and that parol evidence was necessary to show

that the inter-company accounts referred to in Article 9.4 only included the inter-company

accounts with respect to Dyer's income or loss for tax years prior to 1978.

        The district court held the written contract clear and unambiguous and

refused to admit parol evidence.[7]  It found that the 1978 loss fell within the meaning of

"inter-company accounts," as that term was used in Article 9.4.  This finding was based

upon the usual treatment of such losses by Fisk and the fact that Fisk's accountants in

March 1979 had treated Dyer's losses as an account payable to Dyer and had suggested

that Dyer treat the loss as an account receivable from Fisk.  The court of appeals set forth

the standard it would apply in deciding whether parol evidence would be admitted as

follows:

> For this court to resolve the question of law of whether latent ambiguity
> exists in Article 9.4, it must necessarily examine extrinsic evidence. "Such
> evidence is received, not for the purpose of importing into the writing an
> intention not expressed therein, but simply with the intention of elucidating
> the meaning of the words employed." Gibson v. Anderson, 90 So.2d at 694.

Cathbake, 700 F.2d at 656.  The court then proceeded to review the evidence excluded by

the district court, which included an exhibit prepared in conjunction with the negotiations

_____

[7]      [T]he district court concluded that the language of Article 9.4 was "clear"
and "unambiguous";  the district court determined that no parol evidence
was needed to determine the intention of the parties as to the meaning of the
article.  On this basis, the court refused admission of various testimony and
documents which apparently would have illuminated the negotiated
meaning of Article 9.4.

Cathbake 700 F.2d at 655.

for the sale of Dyer. That exhibit, the court of appeals concluded, "indicates that there were indeed express negotiations of specific inter-company accounts." Cathbake, 700 F.2d at 657. The exhibit is headed "INTER COMPANY" and lists amounts representing the reconciliation of federal taxes between Dyer and Fisk through 1977. The exhibit made no mention of the treatment of 1978 taxes, which the court of appeals found important: "[B]ecause there is no mention of 1978 taxes on either page, there is an implication that those taxes were not contemplated among inter-company accounts by the parties during the negotiations." Cathbake, 700 F.2d at 657. The court of appeals concluded that Article 9.4 was ambiguous based upon the parol evidence in the record and that further parol evidence should have been admitted to illuminate the meaning of Article 9.4.

        This court applied exactly the same legal standard announced in Cathbake. Cathbake makes it clear that parol evidence may not be admitted "for the purpose of importing into the writing an intention not expressed therein, but simply with the intention of elucidating the meaning of the words employed." Cathbake, 700 F.2d at 656 (quoting Gibson v. Anderson, 92 So.2d 692, 694 (Ala. 1957)). Although this court did not cite Cathbake in its 1998 opinion, it quoted the following from Moore v. Pennsylvania Castle Energy Corp., 89 F.3d 791 (11th Cir. 1996):

        As the Supreme court of Alabama explained:

        Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the

> intention of elucidating the meaning of the words employed; and in
> its admission, the line which separates evidence which aids the
> *interpretation* of what is in the instrument, from direct evidence of
> intention independent of the instrument, must be kept steadily in
> view; <u>the duty of the court being, to declare the meaning of what is</u>
> <u>written in the instrument, not of what was intended to be written</u>.

1998 Opinion at 14 (citation and parenthetical omitted).  Although this court did not note

the citation to the Alabama Supreme Court case quoted in Moore, it is in fact an expanded

excerpt from Gibson v. Anderson, the very case quoted by Cathbake as stating the legal

standard to be applied to negotiation testimony.  This court applied the same legal

standard as the court in Cathbake.

In addition, this court followed the same procedure as the court of appeals

in Cathbake did to determining whether an ambiguity existed.  This court informed the

parties that it appeared the contract interpretation question might be properly disposed of

by summary judgment motions if the proffered parol evidence did not demonstrate the

presence of an ambiguity in the written contract,  and specifically requested the parties to

inform it of any parol evidence they wished to introduce.  (See, 1998 Opinion at 4.)  The

parties submitted their evidence to the court in connection with the renewed motions for

summary judgment, and this court reviewed that evidence to determine whether a latent

ambiguity existed.   To reiterate, contrary to counsel for Folsom's assertion, this court did

not ban negotiation testimony.  It received all such evidence submitted by the parties and

reviewed it to determine whether it revealed the presence of an ambiguity in the written

contract.  Folsom may disagree with this court's conclusion that the parol evidence did

not reveal the presence of an ambiguity, but its assertion that this court banned such

evidence is false.  The most cursory reading of this court's 1998 opinion would have

revealed that such evidence was reviewed by the court even if counsel for Folsom did not

wish to take this court at its word when it wrote:  "The court has reviewed the proffered

parol evidence submitted by the parties and concludes that none of it establishes the

existence of a latent ambiguity in the written contracts." 1998 Opinion at 14.  Indeed, this

court explained its review of the testimony of Mr. Folsom at page 15 of the 1998 opinion.

In the end, this court concluded that none of Mr. Folsom's testimony "ha[d] the effect of

suggesting that any of the terms in the contract contain latent ambiguities." 1998 Opinion

at 15.  After reviewing the testimony of Mr. Piper, this court concluded that none of the

parol evidence submitted by either side "relate[d] to the interpretation of terms contained

in the writing, but rather recite[d] the parties' relative understanding as to the content of

the negotiations that preceded the written contract documents." 1998 Opinion at 17.

**E.**      **This court did not hold that parol evidence was not admissible merely because it concerned negotiations leading up to the formalization of the agreement into a written contract.**

     In its motion for reconsideration Counsel for Folsom misstated this court's

holding concerning the admissibility of evidence about the negotiations leading up to the

written contract:

> Furthermore, [the court] held that the parties' proffered parol evidence did
> not establish a latent ambiguity because it concerned "negotiations leading
> up to the formalization of the parties' agreement into a written contract."
> Id. at p. 15.

14

(Folsom's Motion for Reconsideration at p. 6 (emphasis added).)  The court did not hold

the proffered parol evidence inadmissible <u>because</u> it concerned "negotiations leading up

to the formalization of the parties' agreement into a written contract."  Following is the

court's discussion found at page fifteen:

> Mr. Folsom's testimony clearly falls within the realm of negotiations
> leading up to the formalization of the parties' agreement into a written
> contract.  <u>None of his testimony has the effect of suggesting that any of the
> terms in the contract contain latent ambiguities</u>.  He simply testifies as to his
> understanding as to what was agreed to <u>before</u> the agreement was
> formalized in writing.

(First emphasis added.)  This court held the proffered parol evidence to be inadmissible

because it did not demonstrate the presence of latent ambiguities.  There is <u>nothing</u> in this

language that would support Folsom's assertion that the court held the parol evidence

inadmissible merely "because it concerned 'negotiations leading up to the formalization

of the parties' agreement into a written contract.'"  This court further discussed the

negotiation issue at page seventeen:

> The proffered testimony clearly falls into the category of
> inadmissible parol evidence.  <u>It does not relate to the interpretation of terms
> contained in the writing</u>, but rather recites the parties' relative
> understanding as to the content of the negotiations that preceded the written
> contract documents.  As the Alabama Supreme Court recognized in <u>Hibbet</u>:

>> Agreements are often the result of protracted
>> negotiations during which terms are modified or abandoned
>> completely; but once the parties have completed their
>> negotiations and have agreed upon a contract as evidenced by
>> a writing, we are no longer interested in the history of their
>> negotiations for purposes of determining what their agreement
>> might have been had their negotiations proceeded differently.

> All their negotiations have then been merged into the written agreement and to the extent that the writing is complete and unambiguous, the prior negotiations are irrelevant for determining the terms of their agreement.
>
> 375 So.2d at 435 (emphasis added).  Therefore, in the instant case, none of the parol evidence proffered by Torus or Folsom is admissible.  <u>It attempts to add to, rather than to explain, the written contract documents</u>.

(Emphasis added.)  From this it should have been abundantly clear that this court rejected Folsom's proffered parol evidence because it did not relate to terms found in the written contract and because it sought to add provisions not having a foundation in the written contract documents, rather than because it involved negotiations.  It is not possible to fairly assert that this court held that the proffered parol evidence was inadmissible <u>because</u> it concerned negotiations.  The proffered parol was held inadmissible because it did not in any way relate to the interpretation of any allegedly ambiguous terms in the written contract.

Counsel for Folsom repeats its distortion of this court's holding on the issue of the admissibility of parol testimony at page nine of their brief:

> As noted <u>supra</u>, the Court held that the parties' proof of a latent ambiguity was defective, since it concerned "negotiations leading up to the formalization of the parties' agreement into a written contract." <u>Id</u>. at 15.  The Court cited <u>no cases</u> to support its position on this key issue.

(Folsom's Motion for Reconsideration at 9.)  This court cited several cases supporting its

position on the proper use of negotiation testimony.[8]  In addition to Hibbet, cited by the

court at page 17 of the 1998 opinion, the court discussed Moore v. Pennsylvania Castle

Energy Corp., 89 F. 3d 791(11th Cir. 1996):

> As the court in Moore noted:
>
>> Under Alabama law, once the parties to a contract have reduced their
>> agreement to writing, all prior statements, promises, and negotiations
>> are merged into the written document.  In the absence of fraud,
>> mistake or illegality, parol evidence is not admissible to explain,
>> contradict, vary, add to, or subtract from the express terms of a
>> complete and unambiguous written agreement.
>
> 89 F.3d at 795 (emphasis added)(citations omitted).   In the absence of an
> ambiguity in the written contract, parol evidence is not admissible.
>
>> Under Alabama law, extrinsic evidence relating to the alleged
>> "true intent" of the parties is not admissible if the written document
>> is clear and unambiguous.  However, resort to parol evidence is
>> proper to show that the contract language contains a "latent
>> ambiguity."  An ambiguity is latent when the language employed is
>> clear and intelligible and suggests but a single meaning, but some
>> extrinsic fact or extraneous evidence creates a necessity for
>> interpretation or a choice among two or more possible meanings.
>
> Moore, 89 F.3d at 795-96 (internal quotation marks and citations omitted)
> (emphasis added).

---

[8]  Of course the court cannot be expected to have cited cases to support the holding
counsel for Folsom seeks to foist upon it.

17

(1998 Opinion at p. 11.)  Although Folsom is correct in suggesting that negotiation evidence may be considered if the contract contains a latent ambiguity, the use of such evidence is limited even in that event.  This court noted that limitation:

> Before considering the parol evidence submitted by the parties and considering whether it demonstrates the presence of a latent ambiguity, it is important to note the limited use to which that evidence may be put even if a latent ambiguity is found.  If the court concludes that a latent ambiguity exists, "parol evidence may be admitted for the purpose of explaining or clarifying the <u>language</u> revealed to be ambiguous, <u>but not for the purpose of uncovering the parties' alleged 'true intent.</u>'"  <u>Moore</u>, 89 F.3d at 796 (emphasis added).  The court continued:
>
> > As the Supreme court of Alabama explained:
> >
> > > Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the intention of elucidating the meaning of the words employed; and in its admission, the line which separates evidence which aids the *interpretation* of what is in the instrument, from direct evidence of intention independent of the instrument, must be kept steadily in view; <u>the duty of the court being, to declare the meaning of what is written in the instrument, not of what was intended to be written.</u>
>
> 89 F.3d at 796 (emphasis supplied by underlining added).  It will be helpful to keep this standard in mind when reviewing the proffered parol evidence.

(1998 Opinion at p. 14.)  The problem with Folsom's proffered parol evidence, even if Article 3.1(b) were found to be ambiguous, is that it does not relate to the words of the written contract.

Folsom essentially seeks to introduce evidence of an agreement not expressed in the written contract:

18

> Paragraph 13.3 was included in the Sales Agreement because I disclosed to
> Charles Piper "Piper", President of Torus, that I would sell the RBOP
> division prior to the ten (10) year period elapsing. I told Piper that I did not
> want this deal unless there were no continuing royalties. I explained to
> Piper that I would develop the RBOP units into a commercial entity,
> subsequently sell the RBOP units and related technology, and pay Torus a
> five percent (5%) royalty on the RBOP units sold. Thereafter, any and all
> obligations under the Agreement to Torus would be satisfied by the five
> percent (5%) royalty paid on the RBOP units sold. The obligation for
> royalty payments to Torus would not be transferred upon my resale of
> RBOP units and related technology. Mr. Piper agreed with me and we
> shook hands on it. At all times, Mr. Charles Piper, the President of Torus,
> was aware of these facts.

(Folsom Aff. ¶ 9.) This excerpt illustrates the problem with Folsom's proffered parol

evidence—it seeks to add terms to the contract that have no foundation in the written

contract. Mr. Folsom does not state that paragraph 3.1(b) was the contract provision

providing that the additional sum would stop upon sale of the RBOP business. Paragraph

13.3 merely allows the parties to transfer their respective rights under the contract. The

wording of paragraph 13.3 cannot be reasonably interpreted as allowing Folsom to be

relieved of its obligation to pay the additional sum upon its sale of the RBOP business.

To adopt Folsom's interpretation would be tantamount to rewriting that paragraph. The

parol evidence rule does not allow this even in cases of ambiguity. It was for this reason,

and not because the proffered parol evidence involved negotiations, that the court refused

to admit it for the purpose of interpreting the written contract.

19

**F.**    <u>**This court did not ignore the role of hybrid ambiguities.**</u>

In its motion counsel for Folsom suggests that this court ignored the role of

hybrid ambiguities.  This is a rather remarkable assertion given that the court in its 1998

opinion cited perhaps the leading case on hybrid ambiguities in Alabama jurisprudence,

<u>Higgins v. Tennessee Coal, Iron & R. Co.</u>, 62 So. 774 (Ala 1913).[9]  This court's

explanation of <u>Higgins</u> should have made it clear that even in the case of hybrid

ambiguities, only the latent ambiguity component may be illuminated by parol evidence.

"There is a hybrid type of patent ambiguity that exists when the contract wording is

unclear on its face, but parol evidence is admitted to remove latent ambiguities that cause

the apparent patent ambiguity."  <u>1998 Opinion</u> (citing <u>Higgins,</u> 62 So. at 774-75).  The

<u>Higgins</u> court, recognizing that the rule of hybrid ambiguities was at least 100 years old,

quoted from <u>Peisch v. Dickson</u>, 19 Fed. Cas. 123, 1 Mason 9, (C.C.D.Mass.)(No.

10,911)(1815).  In that case, Justice Story began by stating the general rule with respect to

ambiguities:

> Nothing is clearer than the general rule,—latent ambiguities may be
> removed by parol evidence, for they arise from the proof of facts aliunde;
> and where the doubt is created by parol evidence, it is reasonable, that it
> should be removed in the same manner.  But patent ambiguities exist in the
> contract itself; and if the language be too doubtful for any settled
> construction, by the admission of parol evidence you create, and do not
> merely construe, the contract.  You attempt to do that for the party, which

---

[9] After mentioning <u>Higgins</u>, counsel for Folsom proceeds to apply the definition of
hybrid ambiguities given in 29A Am. Jur. 2d § 1135.  That definition does not adequately
state the law of hybrid ambiguities in Alabama.

he has not chosen to do for himself; and the law very properly denies such
an authority to courts of justice.

19 Fed. Cas. at 124. Justice Story, however, noted that there is a hybrid type of patent

ambiguity:

> There seems indeed to be an intermediate class of cases, partaking of the
> nature both of patent and latent ambiguities; and that is, where the words
> are all sensible, and have a settled meaning, but at the same time
> consistently admit of two interpretations, according to the subject matter in
> the contemplation of the parties. In such a case, I should think parol
> evidence might be admitted, to show the circumstances, under which the
> contract was made, and the subject matter to which the parties referred.

19 Fed. Cas. at 124. Justice Story is describing a patent ambiguity—the words used have

two contradictory interpretations—and under the traditional rule, parol evidence could not

be used. However, he notes that parol evidence of the circumstances under which the

contract was made might remove the apparent contradiction. Justice Story gives the

following example to explain his ruling:

> For instance, the word "freight" has several meanings in common parlance;
> and if by a written contract a party were to assign his freight in a particular
> ship, it seems to me, that parol evidence might be admitted of the
> circumstances, under which the contract was made, to ascertain, whether it
> referred to goods on board of the ship, or an interest in the earnings of the
> ship; or in other words, to show in which sense the parties intended to use
> the term.

19 Fed. Cas. at 124.

Article 3.1(b) does not contain a hybrid ambiguity. It involves the

interpretation of the definition of "Gross Receipts from the sale or rental of the RBOPs,"

which the settlement agreement defines as "all sums actually received by Purchaser for

the sale of any RBOPs, and all sums actually received by Purchaser for the rental of any RBOPs." This provision does not present a patent ambiguity, and thus cannot constitute a hybrid ambiguity. Nor does it present a latent ambiguity. This court examined the language and the proffered parol testimony to determine whether this provision contained a latent ambiguity.[10] None of the proffered parol evidence was with reference to the wording of Article 3.1(b). Mr. Folsom testified that it was Article 13.3, not Article 3.1(b), that gave Folsom the right to sell the RBOP business without a requirement that the additional sum continue to be paid to Torus.

**G.** **Folsom is incorrect when it asserts that the original agreement would not require Folsom to pay the additional sum following sale of the RBOP business.**

Counsel for Folsom argues that the payments due Torus under the original sales agreement were to be based solely on sales by Folsom. Folsom bases this argument upon references within Articles 3 and 9 of the original sales agreement to sales or rentals by "PURCHASER." The first paragraph of the sales agreement states that the agreement is between "SEAL-TECH, a Division of Folsom Metal Products, Inc., a corporation duly organized and existing under the laws of the State of Alabama, having its principal place of business at 5901 Vulcan Road, Bessemer, Alabama 35023 (hereinafter called 'Purchaser'). . . " and "TORUS EQUIPMENT, Inc. . . . ." It is this "hereinafter called

_____

[10] As noted in subpart G below, this court would have erred in receiving the proffered parol evidence for the purpose of determining whether the written contract was ambiguous, since the interpretation put forward by Folsom is unreasonable.

Purchaser" language that is the basis of Folsom's argument. The original sales agreement does not refer to Folsom by name following the first paragraph.

Folsom's rigid interpretation of "Purchaser" is not reasonable in light of its subsequent sale of the title to the intellectual property rights in the RBOP, which it acquired by virtue of the original sales agreement. The unreasonableness of Folsom's urged interpretation is made clear by analogy to commercial leases, which commonly provide for a rental payment based upon sales by the lessee at the rented property. For example, suppose that in a written commercial lease for a retail store, the lessee is defined as X corporation and the lessor is defined as Y corporation. The lease contract requires the "lessee" to pay a fixed amount each month for 5 years, plus an additional sum representing a percentage of "lessee's sales." The lease contract also provides that it is assignable by either party. Subsequently X corporation assigns its rights under the lease to Z corporation. Would Folsom argue that Y was not entitled to receive the additional amount because X corporation no longer had any sales? Clearly the only reasonable interpretation of the contract would be that "lessee" must now be interpreted to mean Z corporation. This is precisely the interpretation this court applied in the instant case.

The unreasonableness of Folsom's position is made clear by Article 11.1 of the original sales agreement, which provides that "PURCHASER shall have the sole right to prosecute all claims of infringement of any letters patent under U.S. Patent Rights or for wrongful use of the Technical Know-How . . . ." Under Folsom's interpretation of

the sales contract—that when "purchaser" is used it must be interpreted as Folsom—RBOP Tools would not be authorized to prosecute infringement of any patent rights in the RBOP or for unauthorized use of the "Technical Know-How." Surely RBOP Tools would not welcome such an interpretation, for it would indeed be unreasonable.

### H.   Because there is only one reasonable interpretation of Article 3.1(b), parol evidence may not be introduced.

This court noted without elaboration in its 1998 opinion that the question of ambiguity, whether patent, latent or hybrid, only arises after the court applies established rules of construction. This court quoted the following excerpt from Federated Guar. Life Ins. Co. v. Dunn:

> We find little aid in Alabama cases for discerning a legal definition of "ambiguous." Courts of other states have said if a contract remains reasonably susceptible to more than one meaning after the court applies established rules of interpretation, the contract is ambiguous, but if only one reasonable meaning clearly emerges, it is unambiguous. . . . The pertinent rules of interpretation for determining the intent expressed in the contract are: look to the contract as a whole; look to its nature, purpose and the subject matter with which it deals.

439 So.2d 1283, 1285 (Ala. Civ. App. 1983)(emphasis added). After this court determined that there was no latent ambiguity, it returned to the question of interpreting the written contract documents. This court should have pretermitted the issue of parol evidence by first looking to see if Folsom's proffered interpretation was reasonable after the application of established rules of contract interpretation. This court discussed those rules of construction following the discussion of ambiguity and parol evidence. See 1998

24

<u>Opinion</u> pp. 22-28.  When the written contract documents are viewed in the context of the transaction between Torus and Folsom as a whole and its purpose, the interpretation urged by Folsom is clearly unreasonable.

When the three provisions of the written contract that are in dispute are viewed together, only one reasonable interpretation of paragraph 3.1(b) emerges—that "purchaser" means "purchaser or its assignee."  Under Folsom's interpretation of paragraph 3.1(b), paragraphs 10.1(b), which describes a material default to include either parties ceasing to do business, and 13.3, which seems to authorize a sale by either party of its respective business, appear to be inconsistent.  See <u>Folsom Metal Products, Inc. v. Torus Equipment Co.</u>, 113 F.3d 212 (11th Cir. 1997)(noting the apparent conflict between paragraphs 10.1(b) and 13.3).  However, all three provisions may be harmonized under the court's interpretation of paragraph 3.1(b).

Paragraph 10.1 provides that even if Torus ceases to do business or becomes insolvent, it would still be entitled to receive payments of the additional sum as provided in paragraph 3.1(b):

> Provided however, in the event Seller encountering any of such occurances, [sic] it is expressley [sic] agreed that such occurrance [sic] shall not relieve PURCHASER of its obligation to pay the portion of the purchase price for the Technical Know-How, Trade Secrets and the Trademark "ROTATING BLOWOUT PREVENTER" and RBOP: (together with the goodwill associated with such marks) represented by the one-half (½) of the Net Profit Percentage as set forth in Article 3, subparagraph 3.1(b) hereof;

Thus Torus and Folsom agreed that Torus would continue to receive the additional sum

due under paragraph 3.1(b) even if it were unable to fulfill its obligations to sell elastomer

products to Folsom under the terms of Article 3.2 of the sales agreement, as modified by

the Packer Agreement.  This points out the importance to Torus of the additional sum

continuing for the full ten-year term.

Paragraph 13.3 authorizes Folsom to "transfer [its] respective rights, title

and interest hereunder by way of an assignment or otherwise . . . in connection with a sale

of [its] business or substantially all of [its] assets, or otherwise."  Why would the parties

specify that ceasing to do business constituted a material default, while specifically

authorizing Folsom to transfer the RBOP know-how and contract rights in connection

with a sale of its business?  These two paragraphs can be harmonized only  if Folsom's

interpretation of paragraph 3.1(b) is rejected.  If "purchaser" in paragraph 3.1(b) is

construed to mean "purchaser or its assignee," together these three paragraphs would

ensure that Torus would receive the additional sum for ten years regardless of whether

Folsom continued in the RBOP business or sold that business to another company.  On

the other hand, Torus would be protected should Folsom simply cease to do business and

abandon the RBOP project because it would then be in default under paragraph 10.1(b).

Upon Folsom's default, Torus would be free to rescind the contract and resell the RBOP

know-how to another company thus allowing it to continue to profit from sales of RBOP

units.  However, if Folsom ceased to do business because of a sale of its business or assets

in which the RBOP rights were also sold, Torus would still benefit from the development
of the RBOP technology by virtue of continuing to be entitled to receive the additional
sum upon sales or rentals of RBOP units by the purchaser of the RBOP business.

When the appropriate rules of construction are applied to the contract for
the sale of the RBOP know-how, only one reasonable interpretation of Article 3.1(b)
emerges—that it should be interpreted to mean "purchaser or its assignee." Therefore, the
written contract documents are not ambiguous and parol evidence is inadmissible.

## II.

## THE IMPOSITION OF A CONSTRUCTIVE TRUST

Folsom argues that the imposition of a constructive trust was improper
because Folsom was never given an opportunity to argue against the imposition of a
constructive trust and because Torus had not asked for such relief. The imposition of a
constructive trust by the court cannot be viewed in isolation. The court's decision to
impose a constructive trust arose out of RBOP Tools desire to pay into the registry of
court any sums due and owing to Folsom by virtue of the promissory note executed in
connection with the sale of the RBOP business. RBOP Tools had sought such relief in
this action from the very beginning. In its memorandum opinion entered September 2,
1999, (hereinafter "1999 Opinion") this court was attempting to provide RBOP Tools
with a meaningful right of set-off and to protect Torus's right to the additional sum as
provided in the sales agreement.

Folsom's argument that it was not afforded an opportunity to argue against the imposition of a constructive trust is without merit.[11] Torus's position from the outset of the litigation has been that Folsom was not relieved of its obligation to pay the additional sum by its sale of the RBOP business to RBOP Tools. (See e.g. Amended Order on Pretrial Hearing entered June 19, 1996.) After reviewing the briefs submitted by the parties relating to the motions of RBOP Tools for summary judgment and to interplead funds, the court entered an order requesting further briefs by the parties. The court noted the following:

> Because the financial solvency of Folsom has been called into question, and because of the effect its insolvency might have on the future course of this action (in particular on the issue of interpleader), the court requests that the parties provide appropriate evidentiary submissions to support their relative positions on that issue. The financial status of Mr. Folsom might also be relevant, and may be addressed as well.

(Order entered November 9, 1998 at p. 2.) After reviewing the briefs submitted in response to that order, the court was of the opinion that an equitable lien might provide a mechanism for achieving the ends sought by Torus. Therefore, the court again requested briefs in an order entered December 14, 1998. In that order the court noted that "a vendor's lien might exist, which if pleaded the court would be able to enforce in equity except as to intervening parties without knowledge or notice. Torus has argued that

---

[11] The court considers it significant that Folsom still has not presented an argument on the merits against the imposition of a constructive trust other than its assertion that Torus's complaint fails to allege any of the traditional bases for the establishment of a constructive trust.

28

RBOP Tools is with notice." (Order entered December 14, 1998 at p. 1.) The clear import of this is that the court was considering the possibility that an equitable lien in the RBOP business and know-how existed in favor of Torus while it was in the hands of Folsom, and that this lien might have continued in the hands of RBOP Tools if it had had notice of the facts giving rise to the equitable lien. Clearly Folsom should have been put on notice that the court was considering granting equitable relief against it. Additionally, that order contained the following:

> The court also notes, based upon the submissions of the parties, the strong possibility that Folsom Metals Products, Inc. is insolvent, which might provide an independent equity that would allow the court to take various actions that it is considering.

Id. at 2. This, should have alerted Folsom that the court was considering granting equitable relief in favor of Torus that might depend at least in part upon the possible insolvency of Folsom. In response to the court's second request, Torus and RBOP Tools submitted briefs.[12] Torus quoted the following from an early Alabama case on equitable liens:

> An equitable lien arises either from a written contract . . . or is implied and declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. It is settled beyond question that a court of equity is the appropriate tribunal for the enforcement of an equitable . . . lien. . . . Every such agreement for a lien or charge in rem constitutes a trust, and is accordingly governed by the general doctrine applicable to trusts.

---

[12] The parties correctly noted that vendor's liens are restricted under Alabama law to situations involving real property.

(Brief in Support of Motion to Amend Pleadings at p. 4.)  Torus continued it's argument:

> The general rules for equitable liens are, however, discussed in some detail
> in 53 C.J.S. Liens. In § 3, it is stated:
>
>> An equitable lien has the nature of, or is analogous to, a trust and
>> really grows out of the doctrine of constructive trusts.  Both are
>> equitable remedies designed to prevent fraud or unjust
>> enrichment . . . .

Id.

RBOP Tools, in its brief, cited cases noting that equitable liens might be imposed in cases of "'fraud', 'unclean hands', or 'unjust enrichment' . . . ." (RBOP Tool's brief in response to the court's order of December 14, 1998 at 2.)  Further, RBOP Tools quoted from American Family Care, Inc. v. Irwin, 571 So. 2d 1053, 1058 (Ala. 1990): "Equity may impose a constructive trust on property in favor of one beneficially entitled thereto when another holds title to the property by fraud, commission of wrong, abuse of a confidential relationship, or any other form of unconscionable conduct." Id. at 3.  RBOP Tools argued that it had not engaged in any of these but reasserted its position that "it is merely a passive middleman entangled in a dispute between Folsom and Torus." Id.

All of the above should have indicated to Folsom that the court might be considering some sort of equitable remedy that would impact upon Folsom in some manner.  Even after this court's order imposing a constructive trust was entered, Folsom did not file a motion asking the court to reconsider that decision until after the court of

appeals refused to accept the case for interlocutory appeal.[13]  Nor has Folsom in the

present motion for reconsideration demonstrated that it is entitled to prevail on the merits

with respect to the court's imposition of a constructive trust.  Even if Folsom feels it was

not allowed to argue against the merits of the imposition of a constructive trust prior to its

imposition, it clearly has had ample opportunity to argue its position in brief subsequent

thereto, as it has done on the issue of parole evidence.  For these reasons, the court

declines to reconsider its imposition of a constructive trust in its September 2, 1999,

order.

## III.

### PAYMENT OF FOLSOM'S ATTORNEYS FEES OUT OF REGISTRY FUNDS

The court is not persuaded by Folsom's argument that it be allowed to pay

its legal defense in this action out of funds ordered deposited into the registry of court.

Folsom has not cited legal authority to support such a request.  Folsom's suggestion that it

lacks sufficient funds to pay its lawyers, if anything, proves its insolvency and therefore

militates against the relief it requests.  One of the reasons supporting the court's ordering

the payment into the registry of court—to afford RBOP Tools a meaningful right of set-

---

[13] Folsom did file a motion asking the court to alter or amend its order of
September 2, 1999, by including a certification for interlocutory appeal.

off—would be jeopardized should the court allow Folsom to remove those sums to pay its lawyers.  Therefore, Folsom's request is due to be denied.

      For all of the above reasons, Folsom's motion for reconsideration is due to be denied.  An appropriate order will be entered contemporaneously herewith.

      DONE this _17th_ day of January 2001.

          UNITED STATES DISTRICT JUDGE
          J. FOY GUIN, JR.