FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 APR 16 PM 1:12

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| FOLSOM METAL PRODUCTS, INC., an Alabama corporation, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TORUS EQUIPMENT COMPANY, )<br>)<br>Defendant. )<br>================= )<br>)<br>RBOP TOOLS INTERNATIONAL, INC., )<br>a Texas corporation, )<br>)<br>Intervenor-plaintiff. ) | CIVIL ACTION NO. 94-G-0988-S<br><br>ENTERED<br>APR 16 2003 |
| ***************************** | CONSOLIDATED WITH: |
| FOLSOM METAL PRODUCTS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>RBOP TOOLS INTERNATIONAL, INC., )<br>)<br>Defendant. ) | CIVIL ACTION NO. 99-G-0003-S |

**MEMORANDUM OPINION**

This cause is before the court upon the motion of Folsom Metal Products, Inc. for reconsideration and for leave to amend the complaint, or alternatively to reopen the pleadings. [Doc. # 145] Folsom in its motion alleges that newly discovered evidence shows that Torus did not own the rights to the RBOP technology that it purported to sell

161

to Folsom in February 1990.¹ It asks this court to reconsider its previous rulings and to allow Folsom to amend its pleadings to assert new fraud claims against Torus.

Underlying every decision by this court and the court of appeals has been the assumption that Torus owned the proprietary rights to the RBOP technology at the time it purported to sell those rights to Folsom.² The first sentence of the court of appeals decision reversing the entry of summary judgment in favor of Folsom is as follows: "Torus Equipment Inc. <u>owned all rights</u> to a complex machine used to guard against accidents in certain types of oil drilling, known as a rotating blowout preventer ("RBOP")." 113 F. 3d 212 (11ᵗʰ Cir. 1997)(emphasis added).³ The pretrial order, as amended, contains no claim by Folsom for fraud and no claim that Torus did not own the proprietary rights to the RBOP which it purported to sell to Folsom.⁴ The parties

---

¹ The court will, as in its prior opinions, refer to the parties as "Folsom" "Torus" and "RBOP Tools."

² Hereinafter, references to "the RBOP" or "the RBOP technology" will mean those proprietary rights to the RBOP technology (including trade secrets, know-how, patents and other intangible rights) that Torus purported to sell to Folsom, unless the context requires a different meaning.

³ Though it would be appealing to invoke the law-of-the case doctrine and pretermit consideration of Folsom's motion, it appears that the issue of Torus's ownership was neither contested nor presented in the prior appeal. 18B Wright, Miller & Cooper, <u>Federal Practice and Procedure</u> § 4478 at 656 (2002)(law of the case doctrine does not apply to issues that were not contested or presented).

⁴ Several pretrial orders have been entered. The "Amended Order on Pretrial Hearing," entered June 19, 1996, [Doc. # 35] has been deemed by the court to have superseded any prior pretrial orders (<u>See</u> "Amendment to Order on Pretrial Hearing" [Doc. # 47]). It, therefore, contains the presently controlling statement of the parties claims and defenses.

statement of agreed facts submitted in conformity with the pretrial order, as amended, contains the following: "At the beginning of 1990, Torus was the owner of all rights to a rotating blowout preventer ("RBOP")." ("Parties Statement of Agreed Facts" [Doc. # 51].) Unless the pretrial order is amended and Folsom is relieved from the above quoted stipulation made in accordance with the pretrial order, Folsom may not assert its new claims and reconsideration of this court's prior rulings would not be appropriate. See Funding Systems Leasing v. Pugh, 530 F.2d 91, 95 (5th Cir. 1976)(matters stipulated in the pre-trial order are binding upon the parties, absent some modification).

## AMENDMENT OF THE PRETRIAL ORDER

Whether to allow an amendment to the pretrial order rests in the discretion of the trial judge.

> The trial judge is vested with broad discretion to preserve the integrity and purpose of a pretrial order. Basically, these orders and stipulations, freely and fairly entered into are not to be set aside except to avoid manifest injustice. Fed. R. Civ. P. 16. However, in the interest of justice and sound judicial administration, an amendment of a pretrial order should be permitted where no substantial injury will be occasioned to the opposing party, the refusal to allow the amendment might result in injustice to the movant, and the inconvenience to the court is slight.

United States v. Varner, 13 F. 3d 1503, 1507 (11th Cir. 1994)(quoting Sherman v. United States, 462 F.2d 577, 579 (5th Cir. 1972)). However, "[u]pon a finding that an amendment to the pretrial order would result in either substantial injury to the opposing party or inconvenience to the court, the pretrial order should only be amended to avoid manifest injustice." Id. at 1508 (emphasis added). This leads to a two stage consideration of Folsom's motion to amend the pretrial order and stipulation entered in conformity

3

thereto.⁵ The first inquiry is whether the proposed amendment would cause either substantial injury to the opposing party, prejudice to the opposing party, or would result in inconvenience to the court. If the amendment would cause none of these, then it should be allowed. Should the amendment cause any of these, the court must determine whether the amendment must nonetheless be allowed in order to avoid manifest injustice.

In the present case it is clear that Torus would suffer substantial injury and prejudice should Folsom be allowed to amend as requested. All previous discovery and preparation of this action has proceeded without Torus's ownership of the RBOP being an issue. Discovery on the issue of whether Torus did not own the proprietary rights to the RBOP would entail additional expense and further delay the ultimate resolution of this action. Had Folsom raised the issue of Torus's ownership of the RBOP at the outset, much duplication of effort would have been avoided. Depositions and other previous discovery could have included an inquiry into the ownership of the RBOP. To introduce that issue at this late date would require additional discovery and additional expense that could have been avoided. The repetition of discovery proceedings constitutes prejudice to the opposing party. <u>Dussouy v. Gulf Coast Investment Corp.</u> 660 F. 2d 594, 599 (Former 5th Cir. November 1981).⁶ This prejudice could to some extent be ameliorated

---

⁵ Folsom does not specifically ask to be relieved from its stipulation that Torus owned all rights to the rotating blowout preventer that it sold to Folsom, but such a request may be inferred from its motion.

⁶ <u>Dussouy</u> is a Former Fifth Circuit case decided after September 30, 1981. (In <u>Bonner v. City of Prichard</u>, 661 F. 2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered
(continued...)

by taxing the costs of repeated discovery against Folsom. Id. at 599 (taxation of costs of additional discovery against movant may avoid prejudice caused by repeated discovery); Bamm v. GAF Corp., 651 F.2d 389, 392 n. 5 (11th Cir. July 23, 1981)(district court has discretion to tax all costs of additional discovery against movant for leave to amend). However, under the circumstances of this case,[7] such taxation of costs might not remove the prejudice to Torus because of Folsom's inability to pay those costs.[8] Had Folsom raised the issue of Torus's ownership of the RBOP at the outset of this litigation, it is likely that issue would have been resolved prior to consideration of the more complex issues that have been presented to the court for decision.

It is also clear that the introduction of new fraud claims against Torus would cause substantial injury and prejudice to Torus. These claims are not based upon the same facts that have been in issue throughout this litigation. Much evidence on these new issues may no longer be available and witnesses' memories will not be as fresh.

---

[6](...continued)
prior to October 1, 1981.) Dussouy has, however, been accepted as binding precedent by the Eleventh Circuit Court of Appeals. Bank v. Pitt, 928 F. 2d 1108, 1112 n. 4 (11th Cir. 1991) (noting that dicta in prior cases had indicated Former Fifth Circuit cases were binding precedent and treating Dussouy as binding, but noting that its decision would be the same even if the case were not binding).

[7] For example, there is currently a motion pending by Folsom's counsel to withdraw because of Folsom's inability to pay its legal fees. If Folsom is unable to pay its attorneys, it is reasonable to question its ability to pay the costs of repeated discovery.

[8] The court notes that Folsom has not offered to pay the costs of additional discovery. Were the court inclined to allow Folsom to amend, such amendment would be conditioned upon Folsom's agreement to pay those costs and a demonstration that it would be able to pay them should it not prevail on its claims.

5

To say that allowance of Folsom's requests would cause great inconvenience to the court is an understatement. Every ruling made by this court following the reversal by the court of appeals of the entry of summary judgment in favor of Folsom has been premised on the assumption that Torus owned the RBOP at the time it was sold to Folsom. Reconsideration of the court's prior rulings in light of Folsom's new claims would render useless a great amount of the judicial resources previously expended. This judicial waste would include a great deal of judicial resources expended subsequent to the time Folsom allegedly first became aware of questions about Torus's ownership of the RBOP in January 2001. On March 28, 2001, Folsom filed an amended statement of issues remaining for trial, which did not mention the issue of whether Torus owned the RBOP. ("Folsom's Amended Statement of Trial Issue(s)" [Doc. # 119].)[9]

A status conference was held April 4, 2001, to consider the referral of several matters to a United States Magistrate Judge as special master. At that conference the court was made aware for the first time of Folsom's assertion that Torus might not have owned the RBOP technology. Counsel for Folsom asserted that Mr. Folsom had recently obtained information indicating that Hughes Tool Company ("Hughes") did not sell to Torus the RBOP technology that Torus purported to subsequently sell to Folsom. This revelation by Folsom's attorney came at the close of the conference. The court

---

[9] The court acknowledges that leave to amend the pretrial order would be necessary to allow Folsom to raise the issue of Torus's ownership of the RBOP at trial. However, Folsom allegedly became aware of this issue in January 2001. Filing a list of issues for trial without moving for such leave should, under the circumstances, be deemed a further ratification of Folsom's prior stipulation that Torus owned the RBOP.

raised the question of whether the law of adverse possession would preclude Folsom's argument and subsequent to the conference furnished the parties with an Am Jur. citation on the subject of adverse possession of personal property.[10] The motion seeking to assert new claims was not filed until November 7, 2001. Folsom remained silent for seven months before filing its motion seeking leave to amend. This delay weighs heavily against allowing Folsom to amend.

  At the April 4, 2001, status conference the court was also informed by Folsom's counsel that Folsom was not paying its legal fees. Because of the impact a withdrawal by Folsom's counsel would have on proceedings before the special master, the court instructed Folsom's counsel to decide within two weeks whether it would seek to withdraw. This should have made clear to Folsom the importance of coming forth with the new claims it now seeks to assert so that the court and special master would not expend judicial resources considering issues that might be rendered moot should Folsom succeed on it's new claims.

---

[10] Adverse possession of personal property is discussed at 3 Am. Jur. 2d § 12. That section notes that "if a person has the peaceable, undisturbed, open possession of personal property, with an assertion of ownership, for the term that would bar an action for its recovery by the true owner, the claimant has acquired title superior to that of the true owner . . . ." Under Alabama law, the statute of limitations for the recovery of personal property is six years. Ala. Code § 6-2-34(3). It has been held that "[a]s applied to suits for personal property adversely held, the statute of limitations does not affect the remedy merely, as in suits for debts, but it acts on the title, operating to transfer it to the possessor." Van Antwerp v. Van Antwerp 5 So.2d 73, (Ala. 1941)(quoting Grunewald Co. v. Copeland, 30 So. 878, 131 Ala. 345(1901)).

A review of the court docket shows that between April 4, 2001, and November 7, 2001, two on the record hearings were held, including an evidentiary hearing before the special master. Therefore, even subsequent to the time Folsom first alerted the court of its doubt that Torus owned the RBOP, significant additional judicial resources were expended by the court.[11] Folsom's continued failure to assert its new claims while significant and costly judicial proceedings took place weighs heavily against allowing Folsom to amend.

Without question the court would be inconvenienced if Folsom were allowed to introduce the issue of Torus's ownership of the RBOP into this action at this time. It is also clear that Torus would suffer substantial injury and prejudice. Therefore, the inquiry turns to whether manifest injustice can only be prevented by allowing the pretrial order and stipulations to be amended.

In determining whether manifest justice can only be prevented by allowing Folsom to amend the pretrial order and to withdraw its stipulation entered in accordance thereto, the court will consider whether Folsom should be allowed to amend the pleadings to assert new fraud claims against Torus and to assert the affirmative defense of failure of

---

[11] Folsom's delay in asserting its claims will be addressed in greater detail below. At this point it is sufficient to note that Folsom's delay in asserting its claims, even measured from the conference held April 4, 2001, caused the court and parties to expend additional resources considering issues that might be rendered moot if Folsom's new allegations were proved.

consideration.[12] If under the applicable legal standards Folsom's amendment would not be allowed, there would be no manifest injustice in refusing to amend the pretrial order.

## AMENDMENT OF THE PLEADINGS

Whether to allow an amendment to the pleadings under Rule 15(a) or 13(f)[13] of the Federal Rules of Civil Procedure is in the sound discretion of the trial court. National Distillers and Chemical Corp. v. Brad's Machine Products, Inc., 666 F.2d 492, 495 (11th Cir. 1982)(citing Freeman v. Continental Gin Co., 381 F.2d 459, 468 (5th Cir. 1967). However, the trial court must have reasons to deny the motion. Id. ("In Freeman, this court held that where the trial court has reason to deny the motion to amend, this court will leave that decision undisturbed.") Reasons for denying a motion for leave to amend include: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

---

[12] Folsom, in its motion to reconsider asserts that "if Torus did not own the rights to the technology it purported to sell to Folsom, then . . . Folsom should not owe any royalties to Torus pursuant to those purported "sales" . . . ." Although Folsom does not specifically denominate this as a failure of consideration defense, it clearly constitutes a defense in the nature of an avoidance or affirmative defense. Folsom's failure to assert this defense in its answer to Torus's counterclaim would normally amount to a waiver of that defense. American National Bank of Jacksonville v. F.D.I., 710 F.2d 1528, 1537 (11th Cir. 1983)(failure to assert affirmative defense in responsive pleading constitutes a waiver of the defense).

[13] Whether to allow an amendment to assert an omitted counterclaim is governed by Rule 13(f), which provides as follows: "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires the pleader may by leave of court set up the counterclaim by amendment." Fed. R. Civ. P. 13(f). Courts have applied the same standard to amendments sought under either Rule 15(a) or 13(f). See eg. T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, 629 F.2d 338, 370 n. 68 (5th Cir. 1980)(citing cases treating the rules equally).

to the opposing party by virtue of allowance of the amendment, futility of the amendment" and similar grounds. Id. (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L. Ed. 2d 222 (1962)).

Freeman v. Continental Gin Co. is especially relevant to the issue before the court in the present case. Freeman involved a contractual dispute over the sale of cotton ginning equipment to the plaintiff by Continental Gin Company. The district court granted summary judgment in favor of the defendant, Continental Gin, on plaintiff's contract claims.[14] More than eight months after the grant of summary judgment, the plaintiff filed a motion to amend his answer and counterclaim, and subsequently filed a motion to set aside or reopen the summary judgement previously granted. Id. at 468. The plaintiff sought to assert fraud claims against Continental Gin based upon oral promises and representations that had been held inadmissible under the parol evidence rule when offered in connection with plaintiff's breach of contract claims. The district court "denied leave to amend because of undue delay in making the motion." Id. In reviewing the district court's refusal to allow the amendment, the court of appeals noted that allowance of amendments "is committed to the informed, careful judgment and discretion of the Trial Judge as he superintends the development of a cause toward its ultimate

---

[14] The propriety of summary judgment depended upon whether the district court properly refused to admit parol evidence in the form of deposition testimony by the plaintiff. This makes Freeman doubly relevant in the present case. Freeman involved the Mississippi parol evidence rule, which appears identical to the rule in Alabama. The court's discussion of the parol evidence issue is very relevant to the parol evidence issues raised in the present case and buttresses this court's prior rulings relating to the admission of parol evidence.

10

position." Id. (citations omitted). The <u>Freeman</u> court began its consideration by noting emphatically that "[i]t is clear that lack of diligence is reason for refusing to permit amendment." Id. at 469. The court continued:

> Where there has been such lack of diligence, the burden is on the party seeking to amend to show that the delay was due to oversight, inadvertence, or excusable neglect. Leave will be denied unless he shows some valid reason for his neglect and delay.

Id. (citations and internal quotation marks omitted). The court observed that the motion to amend was made more than three years after the events in question had occurred[15] and that the facts were fully known to the plaintiff from the outset of the lawsuit. Id.

It was also important to the court that plaintiff did not seek to assert his claims of fraud until after his breach of contract claims were rejected. Id. The court observed:

> A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim. Liberality in amendment is important . . . but equal attention should be given to the proposition that there must be an end to a particular litigation.

Id. (quotation marks omitted). That a summary judgment had been granted was also considered to be an independent reason for refusing the amendment: "There is even more reason for refusing to allow amendment long after summary judgment has been granted." Id. at 469. The rationale was expressed as follows:

> Much of the value of summary judgment procedure in the cases for which it is appropriate . . . would be dissipated if a party were free to rely on one

---

[15] In the present case, over 10 years had elapsed before Folsom filed is motion seeking leave to amend.

11

> theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back long thereafter and fight on the basis of some other theory.

Id. at 469-70. This policy favoring finality must be weighed against the policy favoring liberality of amendment. In striking the balance between these two competing policies, courts have not favored long delays in seeking to amend. It has been held that "[a]t some point in time delay . . . can be procedurally fatal." Gregory v. Mitchell, 634 F.2d 199, 203 (5th Cir. June 12, 1981). In Gregory, the court held that when apparent lack of diligence accompanies a sufficiently long delay, the burden shifts to the movant to show that the delay was due to oversight, inadvertence, or excusable neglect. Id. (quotation marks omitted).

Applying the above rules to the present case it is clear to the court that Folsom's motion should be denied. The contract of sale by which Folsom acquired the rights to the RBOP technology from Torus recites that the RBOP was "originally developed and manufactured by REGAN FORGE in California and later sold to Hughes Tool Company from whom it was purchased by SELLER." (Sales Agreement at ¶ 1.1.) This clearly put Folsom on notice that Torus had purchased the technology from Hughes Tool Company. Folsom was represented in the transaction by able legal counsel, and no doubt would have satisfied itself that Torus did in fact own the technology it purported to sell prior to the finalization of the sales agreement. The exercise of due diligence would have required Folsom to inquire as to Torus's ownership of the RBOP technology prior to finalization of the sale.

Mr. Folsom in his affidavit avers that he had no reason to question Torus's ownership of the RBOP technology at the time Folsom purchased it from Torus:

> Mr. Charles Piper represented to me that he had purchased the rights to the RBOP technology from Hughes Tool Company ("Hughes") in 1985. I had no reason to doubt this assertion since Piper had the drawings and technical information on the RBOP in his possession. I also had been told by one of my employees, Mr. Mike Tagendahl [sic.], that he knew of Piper purchasing some product lines from Hughes.

(Folsom Aff. at ¶3.) This hardly constitutes due diligence. Mr. Folsom is obviously a sophisticated businessman and it is not believable that his company would purchase the RBOP technology for $100,000 without more evidence that Torus owned that technology. To rely solely on the above statements without further inquiry in the context of a complicated business transaction would be unreasonable. A reasonable person would not buy a used car based solely upon representations analogous to those put forward by Mr. Folsom.

It is also illuminating that the parties contracted regarding a possible lawsuit against Folsom for patent infringement or wrongful use of the RBOP technology:

> In the event the PURCHASER . . . is sued for infringement of letters patent, Trademarks or wrongful use of technology which is in conflict with the transfer herein, . . . SELLER shall, by counsel agreed upon by PURCHASER and SELLER, undertake to defend any such suit at the cost of SELLER . . . .

(Sales Agreement at ¶11.3.) The parties clearly understood at the time of the sale of the RBOP technology in 1990 the consequences that might ensue if it turned out Torus was not the owner of the RBOP technology that it purported to sell to Folsom.[16]

When viewed in the context of a sale of proprietary technology that might include patent rights, Folsom's excessive delay in raising its new claims cannot be excused. In <u>Freeman</u> the plaintiff was aware from the outset of the facts underlying the fraud claims that he sought to add by amendment. In the present case, Folsom alleges that it only recently discovered facts supporting its claim that Torus did not own the RBOP technology that it purported to sell to Folsom in 1990. However, it is clear to the court that if that is indeed the case, it is due to Folsom's inexcusable neglect. Folsom has not met its burden of showing that the long delay in seeking to amend was excusable. Nor has Folsom shown that the delay from January 2001, the time Folsom allegedly first became aware of questions about Torus's ownership of the RBOP, until it filed its motion on November 7, 2001, was excusable. This is a case where excessive delay in seeking to amend warrants refusal of leave to amend. Therefore, failing to allow Folsom to amend the pretrial order to assert its new claims will not result in manifest injustice.

---

[16] Folsom has offered no evidence that it or its successors to the RBOP Technology have been sued for patent infringement or wrongful use of that technology.

## FAILING TO RELIEVE FOLSOM FROM ITS STIPULATIONS WOULD NOT RESULT IN MANIFEST INJUSTICE

To determine whether manifest injustice would result if Folsom is not relieved from its stipulation made in accordance with the pretrial order, the court will examine the evidence that Folsom's claims creates a question as to Torus's ownership of the RBOP technology. Folsom's argument is chiefly based upon a patent license agreement between Hughes and Vetco Gray Inc. ("Vetco Gray") dated October 14, 1986.[17] That agreement apparently included a license covering United States Patent number 3,492,007 (issued January 27, 1970). It should be noted that the patent expired January 27, 1987.[18] This was just over three months after the date of this license, and over three years prior to the sale from Torus to Folsom. Folsom has submitted a certified assignment record from the United States Patent Office that shows an assignment of patent number 3,492,007 from Regan Offshore International, Inc. to Hughes.[19] Because the license assignment is from Regan *Offshore*, Folsom argues that the blowout preventer covered by patent number 3,492,007 was an offshore product.[20] Also in support of its

---

[17] This license agreement was executed after Torus purchased the "Torus Blowout Preventer" from Hughes on December 18, 1985.

[18] Prior to 1994, the term of a patent was 17 years. See, 35 U.S.C.A. § 154, Historical and Statutory Notes, 1994 Amendments (West 2001).

[19] It is also noteworthy that the certified assignment record shows no other assignments—neither to Torus nor to Vetco Gray.

[20] Folsom's argument apparently assumes that Torus did not purchase offshore products from Hughes. It should be noted, however, that the contracts of sale (both from Hughes to Torus and from Torus to Folsom) do not limit the products sold by describing
(continued...)

claim that Torus did not purchase the RBOP technology, Folsom has submitted a Regan Forge catalogue. Regan blowout preventers are shown at page 4167. Folsom argues that the "Regan Type TR-2 High Pressure Rotating B.O.P." shown on that page was the same RBOP covered by patent number 3,492,007, and therefore was an offshore product. This argument, however, is contradicted by the Regan Forge catalogue itself. The catalogue is divided into two sections, the first being "Subsea Drilling & Completion Equipment." The second division is entitled "General Oilfield Equipment." The TR-2 RBOP is contained in the second section. There is nothing in the description of the TR-2 RBOP that would indicate it is intended exclusively for offshore applications. Furthermore, the uncontradicted affidavit testimony of Louis D. Slaughter is that the TR-2 RBOP was an "onshore" product. Therefore, this evidence does not support Folsom's claim that Torus did not own the RBOP technology that it sold Folsom.

Folsom has also submitted the affidavit of Michael J. Tangedahl in support of its motion. In that affidavit, Mr. Tangedahl avers as follows:

> At the Offshore Technology Conference, in May, 1998, Britton Piper told me that an employee of Vetco Gray, Inc. ("Vetco"), had confronted him with the fact that Vetco claimed ownership to the rights to the TR-2 RBOP. Britt Piper said that he had told the Vetco employee to "get in line."

(Tangedahl Aff. ¶2.) This evidence is hearsay within hearsay and to be admissible, both parts of the combined statement must fall within an exception to the hearsay rule. Fed. R. Evid. 805. Folsom has not demonstrated that either part fits within any of the recognized

---

[20](...continued)
them as "onshore."

16

exceptions to the hearsay rule. In particular, there has been no showing that either Britton Piper or the unnamed Vetco Gray employee fall within the admission exception to the hearsay rule. Fed. R. Evid. 801(d)(2). Nor have any other exceptions to the hearsay rule been shown. Therefore, the affidavit of Tangedahl is inadmissible to show that Torus did not own the RBOP technology that it purported to sell to Folsom.

Nor does the affidavit of Mr. Folsom contain admissible evidence that would support Folsom's allegation that Torus did not own the RBOP technology. Mr. Folsom asserts as follows:

> In January, 2001, I was informed by Mr. Tagendahl [sic] that management personnel at Vetco Gray . . . another company that manufactures exploration equipment, had concerns that Piper and Torus did not own the rights to the RBOP technology that they sold to my company. I had discussions with personnel at Vetco and learned that, indeed, Vetco was licensed by Hughes to use the very same RBOP technology that Piper and Torus had sold to my company.[21]

(Folsom Aff. ¶ 5.) Mr. Folsom's statement about what Mr. Tangedahl said is inadmissible for the same reason as Mr. Tangedahl's affidavit. Nor does Mr. Folsom identify the personnel at Vetco Gray from whom his information came or even attempt to demonstrate that their statements would fall within one of the exceptions to the hearsay rule.

---

[21] The court notes that even if Hughes Tool in fact licensed the same RBOP Technology to Vetco Gray, such subsequent license would not mean that the technology had not previously been sold to Torus. Once Hughes Tool sold the RBOP technology to Torus, the doctrine of nemo dat qui non habet (no one may transfer more than he owns) would prevent Hughes Tool from selling it to Vetco Gray. None of the exceptions to that doctrine have been shown by Folsom.

17

The evidence submitted by Folsom either fails to support its claim or is inadmissible. Therefore, Folsom has not demonstrated that it would suffer manifest injustice if not relieved from its stipulation made in accordance with the pretrial order.

**RECONSIDERATION OF THIS COURT'S PRIOR ORDERS**

The above demonstrates that the evidence submitted by Folsom is insufficient to warrant reconsideration of this court's prior rulings. The admissible evidence submitted by Folsom does not create a genuine issue of fact as to any of the issues upon which the prior summary judgment orders were based. Furthermore, Torus has presented admissible and probative evidence negativing Folsom's claims.[22] Louis D. Slaughter avers in his affidavit that he worked for Hughes Offshore during the time when Torus purchased the RBOP technology from Hughes Tool Company. The following is an excerpt from his affidavit:

> 7. The rotating blowout preventer developed by Regan Forge & Engineering was an onshore drilling product, and did not work in offshore drilling applications.
>
> 8. In 1985, Piper Oilfield Products, Inc. desired to purchase the "Regan onshore product line" from Hughes Tool Company.

---

[22] The court has not reviewed the letter attached as "Exhibit D" to the "Brief of Torus in Opposition to Folsom's Motion to Reconsider." The court was informed by staff only that the letter contained discussion of settlement. The court as a general rule does not wish to be informed of the details of settlement negotiations in non-jury matters. See Fed. R. Evid. 403. Torus was not offering the letter to demonstrate liability, but rather to show the delay of Folsom in asserting its new claims. However, there is sufficient evidence in the record on that issue and the exhibit was redacted from the brief prior to its review by the court.

>9. Piper Oilfield Products, Inc. caused a corporation to be established, which was named Torus Equipment, Inc., which during 1985 purchased the entire "Regan onshore product line" from Hughes Tool Company, which included all Torus blowout preventers and products, as well as all Torus related items, including, but not limited to, the Torus Rotating Blowout Preventer. The only items held back from Torus Equipment, Inc. and retained by Hughes Tool Company from the "Regan onshore product line" was a JR blowout preventer, a Fast Shutoff coupling, and a Schlumberger wire line unit.
>
>10. I was personally involved in making sure that Torus Equipment, Inc. received all of the product line that it had purchased. There was no inventory of rotating blowout preventers to deliver, but all of the drawings and engineering data for the remainder of the Torus product line were delivered to Torus Equipment, Inc.
>
>11. Earlier this year (2001), I spoke to Clint Folsom, who questioned me about whether the rotating blowout preventer had been sold by Hughes Tool Company to Torus Equipment, Inc. I told him that if I were on the witness stand, I would have to truthfully state that the rotating blowout preventer was sold to Torus Equipment, Inc.

(Slaughter Aff. ¶¶ 7-11.) This uncontradicted affidavit strongly supports Torus's claim that it owned the RBOP technology that is the subject of this lawsuit.

Torus also submitted the affidavit of Britton Piper to contradict Folsom's claim that Torus did not own the RBOP technology. Mr. Piper states that he was personally involved in the sale of the RBOP technology to Torus in 1985. He states that the product line purchased by Torus from Hughes Tool included the "Rotating Blowout Preventer ('RBOP')" and that the "RBOP had been designated by Hughes Tool Company, or its predecessor in interest, as the 'TR2' which stood for Torus Rotating Blowout Preventer, Second Series." (Britton Piper Aff. ¶¶ 8-11.) Mr. Piper further avers that shortly following the closing, Torus received from Hughes Tool "all product and

production drawings . . . that related to the manufacture, assembly, operation or repair of the Torus Blowout Preventer product line, including all such product and production drawings for the RBOP." (Britton Piper Aff. ¶ 12.) This further supports Torus's claim that it owned the RBOP technology that it purported to sell to Folsom.

The affidavits submitted by Torus have not been contradicted by admissible evidence and prevent there being a genuine issue of fact concerning Torus's ownership of the RBOP Technology.[23] A reasonable trier of fact could not find from the admissible evidence of record that Torus did not own the RBOP technology. Therefore, Folsom's motion for reconsideration is due to be denied.

## CONCLUSION

For all of the above reasons Folsom's motion for reconsideration and for leave to amend is due to be denied in its entirety. An appropriate order will be entered contemporaneously herewith.

DONE this 16th day of April 2003.

UNITED STATES DISTRICT JUDGE
U.S. FOY GUIN, JR.

---

[23] The evidence submitted by Torus demonstrates the futility of Folsom's proffered amendment. The court's denial of Folsom's requested amendment is not based upon it being futile. Nonetheless, the futility of the proffered amendment provides an additional reason for its denial.